Noe VILLANUEVA, Plaintiff-Appellee,

v.

Oscar B. McINNIS, Defendant-Appellant.

No. 82–2402.

United States Court of Appeals,
Fifth Circuit.

Jan. 23, 1984.

Oscar B. McInnis, McAllen, Tex., pro se.

Monte Lee Sherrod, Houston, Tex., for plaintiff-appellee.

Before REAVLEY, RANDALL and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In this civil rights suit Oscar B. McInnis, formerly district attorney for Hidalgo County, Texas, appeals a jury award of $90,000 for damages for conspiring to murder Noe Villanueva. 42 U.S.C. § 1983.[1] McInnis contends that the complaint failed

---

1. 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

to state a claim, that the district judge should have recused himself, and that Villanueva failed to prove a conspiracy, action under color of state law or a deprivation of any constitutional rights. Persuaded that Villanueva failed to prove that he was deprived of a constitutional right, we reverse.

## I

We turn to the trial viewing the evidence in the light most favorable to Villanueva. *Boeing v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969) (en banc). When Villanueva and Patricia Parada were divorced on February 12, 1974 Parada was given custody of Lorena, their child, and Villanueva received visitation privileges. On June 15, 1975 Villanueva, concerned for Lorena's bruised appearance and frustrated over Parada's failure to regularly deliver the child for visitation privileges, took Lorena from Hidalgo County and settled with the child in Houston, where Villanueva had relatives.

In October 1976 Villanueva was arrested in Houston for violation of the custody order and sent to Edinburg jail in Hidalgo County. There he first met McInnis, who, using foul language, asked Villanueva to divulge Lorena's location. Villanueva asked McInnis when he was going to see a judge, to which McInnis replied that he wasn't going to see anybody and that instead Villanueva should call his family, presumably to locate Lorena. Villanueva stayed in jail twenty-six days before he saw a judge. The state court judge sent Villanueva, under custody, back to Houston to find Lorena. Villanueva's relatives, with whom Lorena was supposedly staying, had moved and could not be located.

Villanueva was returned to the Edinburg jail. He was found guilty of violating the custody order and sentenced to twenty days in jail, after which he would be given seven days to return with Lorena. The night before his scheduled release he was served with an arrest warrant for possession of marijuana, but made bail and was released

the next day. At this time Villanueva was not arraigned, formally charged or told when to reappear for the marijuana charge. When he asked McInnis for his charges, McInnis tore off a piece of paper from a grocery bag, signed it, and told him "this is all you need."

After his release, Villanueva returned to Houston and found his daughter within two days but did not return her to the court. Out of fear he did not return to Hidalgo County. He was found with Parada and Lorena at a Border Patrol checkpoint on March 6, 1978 and was arrested for bond-jumping on the marijuana charge. Villanueva plead guilty to the bondjumping charge and the marijuana charge was dropped. He was sentenced to ninety days at Edinburg jail, but, with good behavior, was released on May 5, 1982 after serving sixty days.

It was during this incarceration that McInnis entered into an agreement to murder Villanueva. Daniel Rodriguez, serving a sentence for pleading guilty to murder without malice, was also then a prisoner. McInnis met with Rodriguez at the jail in March or April, 1974. McInnis told Rodriguez that he was transferring Villanueva to his cell and that he wanted Rodriguez to learn what Villanueva planned to do when released from jail. McInnis testified that he did this to find out whether Villanueva planned to abduct Lorena again.[2] Villanueva was transferred to Rodriguez's cell the following day. Rodriguez did not ask him anything, however, and at Rodriguez's request Villanueva was removed from Rodriguez's cell after three or four days.

A few days after Villanueva was removed from Rodriguez's cell, McInnis told Rodriguez that he wanted to keep Villanueva in jail because of the difficulties Villanueva had caused Parada and Lorena. Rodriguez suggested a marijuana framing scheme that McInnis agreed to but which was never carried out. The next week Rodriguez told McInnis that the only way to

---

2. McInnis invoked the privilege against self-incrimination when asked if he had ever had an affair with Parada or if he had spoken to Rodri-

guez during the period March through May 1982.

get Villanueva was to shoot him. McInnis asked Rodriguez to arrange the murder. In return for his assistance McInnis said he would try to get Rodriguez released. Rodriguez contacted a hit man, Jesus Cantu, in Reynosa, Mexico.

At this point, however, Rodriguez began to fear that he was getting set up by McInnis. He called Cantu and told him to forget about the hit. He then notified the sheriff and the FBI was brought in. The sheriff and FBI told Rodriguez to continue to pretend to McInnis that the hit was still planned. Rodriguez and McInnis discussed Villanueva's release date and ways to get Villanueva to Reynosa. At first Rodriguez was to inveigle Villanueva to go to Reynosa, but this plan was scrapped. Instead McInnis talked to Parada and she arranged to meet Villanueva in Reynosa after his release from prison. A date for the "murder" was set.

After his release in May 1975, Villanueva, on the FBI's suggestion, did not go to Reynosa. Rodriguez, however, reported to McInnis that the hit had been made and as proof gave McInnis Villanueva's identification card and crucifix, both supplied by the FBI. McInnis took the card and crucifix from Rodriguez and gave him the address of some parole people in Dallas, Texas.

During his March through May stay in prison Villanueva was treated as any other prisoner. He was not aware of any plan to take his life until after his release from prison.

After his release from prison Villanueva moved to Houston, where he worked for about four months. He then returned to Hidalgo County and was unemployed for about eight months. Villanueva interviewed for twelve to fourteen positions for which he was qualified but was refused employment. At these interviews he was asked whether he was involved in the "Oscar McInnis" case- and if he had a criminal record. On cross-examination he testified that it was his criminal record that prevented him from getting a job. He later worked for an auto supply company for a year and two months but quit because people made remarks about himself, McInnis and Parada. He testified that he continues to be embarrassed at his present job and on the street.

Villanueva sued attempting to state claims under 42 U.S.C. 1983 alleging that McInnis deprived him of his constitutional rights because of his arrest, detention, processing and the conspiracy to commit murder. He claimed damages based on loss of employment during his period of incarceration, loss of his ability to gain employment due to his criminal record, and mental pain and suffering.

The district court denied McInnis's motion to dismiss for failure to state a claim and request that the district judge recuse himself because he had earlier presided over a trial against McInnis for perjury resulting from the same incident. That trial had resulted in a hung jury and the charges were dropped.

After Villanueva rested his case, the district court, on grounds of prosecutorial immunity, dismissed all claims except for conspiracy to murder. Villanueva does not here question this dismissal. McInnis's motions for directed verdict on the remaining claim of conspiracy were denied. The district court charged the jury that they must find that McInnis, acting under color of state law, engaged in conduct which deprived Villanueva of his constitutional right "that he should not be deprived of life without due process of law." Answering Rule 49 interrogatories the jury found for Villanueva and awarded $10,000 compensatory, $30,000 for "constitutional" and $50,000 for punitive damages. The court then awarded attorney's fees to Villanueva's lawyer.

## II

Villanueva contends that Rule 50(b) of the Federal Rules of Civil Procedure precludes the district court, and this court, from entertaining McInnis's motion for judgment notwithstanding the verdict because McInnis failed to move for a directed

verdict after all the evidence had been presented.

At the close of the testimony McInnis told the district judge that he wished to object to the proposed jury instructions and he was instructed to do so after the instructions were given to the jury. At that time McInnis objected that Villanueva failed to prove either any conspiracy or denial of a constitutional right. The district court stated that those objections went toward whether the case should go to the jury but also treated them as being aimed at the charge.

This circuit has excused a defendant's technical noncompliance caused by a failure to renew a motion for directed verdict where the purposes of Rule 50(b) have been satisfied. *Bohrer v. Hanes Corp.,* 715 F.2d 213, 217 (5th Cir.1983); *Quinn v. Southwest Wood Products, Inc.,* 597 F.2d 1018, 1024–25 (5th Cir.1979); *Jack Cole Co. v. Hudson,* 409 F.2d 188, 191 (5th Cir.1969); *Roberts v. Pierce,* 398 F.2d 954, 956 (5th Cir.1968). We recently noted that Rule 50(b) serves two purposes:

> to enable the trial court to re-examine the question of evidentiary insufficiency as a matter of law if the jury returns a verdict contrary to the movant, and to alert the opposing party to the insufficiency before the case is submitted to the jury, thereby affording it an opportunity to cure any defects in proof should the motion have merit.

*Bohrer v. Haynes Corp.,* 715 F.2d at 216. *See also Halsell v. Kimberly-Clark Corp.,* 683 F.2d 285, 294 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983).

In *Quinn* defendants specifically challenged the sufficiency of the evidence in a motion for directed verdict at the close of plaintiff's case. They did not renew their motion after all the evidence was presented. After the jury had been charged and retired but before it began to deliberate, however, they generally moved for a directed verdict and objected to a special interrogatory on sufficiency of evidence grounds. The court found that the claimed deficiency in the evidence had been brought to the attention of both the court and opposing counsel. The court also noted that the defendant's motion for a judgment notwithstanding the evidence was based on the same objections specifically urged in the prior directed verdict motion submitted after the close of plaintiffs' evidence. *Quinn v. Southwest Wood Products, Inc.,* 597 F.2d at 1026.

Similarly, in *Jack Cole Co. v. Hudson,* 409 F.2d at 191, the court found that a request that the jury be instructed to find for defendants was a sufficient predicate for a subsequent motion for judgment notwithstanding the verdict where the defendants had moved for a directed verdict after the end of plaintiff's case and where the court was aware of the reasons for the requested jury instruction.

Most recently in *Bohrer* this court found it unnecessary for defendants to renew a motion for directed verdict made at the close of plaintiff's case where the court had taken the motion under advisement and invited defendants to reurge their position "by motion for judgment n.o.v. or motion at the close of the evidence." *Bohrer v. Hanes Corp.,* 715 F.2d at 217. In *Bohrer, supra,* 715 F.2d at 217, we noted agreement with the Seventh Circuit's pronouncement that although:

> [i]t is certainly the better and safer practice to renew the motion for directed verdict at the close of all the evidence, ... "[t]he application of Rule 50(b) in any case 'should be examined in the light of the accomplishment of [its] particular purpose[s] as well as in the general context of securing a fair trial for all concerned in the quest for truth.'"

*Bonner v. Coughlin,* 657 F.2d 931, 939 (7th Cir.1981) (*quoting Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.,* 585 F.2d 821, 825 (7th Cir.1978), *cert. denied,* 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979)).

Turning to our case there is no question but that Villanueva's counsel was informed of McInnis's claims of insufficiency of the evidence. In his motions for a directed verdict at the end of Villanueva's case,

McInnis specifically noted Villanueva's failure to prove either a deprivation of a constitutional right, action under color of state law, or a conspiracy. McInnis was prepared to object to the proposed charge at the close of all the evidence but was told to do so after the presentation of closing arguments and jury instructions. At that time, McInnis objected to Villanueva's failure to present sufficient evidence on conspiracy or a denial of a constitutional right. The trial court recognized that McInnis's claims went to the sufficiency of the evidence. When McInnis made his motions the jury had not yet begun deliberations.

We hold that McInnis's actions were a sufficient approximation of a renewed motion for directed verdict to support his later motion for judgment notwithstanding the verdict. To deny entertainment of McInnis's motion would be to "succumb to a nominalism and a rigid trial scenario as equally at variance as ambush with the spirit of our rules." *Quinn v. Southwest Wood Products, Inc.,* 597 F.2d at 1025.

### III

We note that § 1983 "neither provides a general remedy for the alleged tort of state officials nor opens the federal courthouse doors to relieve the complaints of all who suffer injury at the hands of the state or its officers." *White v. Thomas,* 660 F.2d 680, 683 (5th Cir.1981). It reaches no further than deprivation of a federally protected or constitutionally secured right or privilege.

We turn directly to the question of whether Villanueva proved such a deprivation. Villanueva alleged and, we may assume, proved, a conspiracy to murder. He points to no other claimed deprivation. Of course murder without due process by a person acting under color of state law denies a federal right, *Brazier v. Cherry,* 293 F.2d 401, 404–05 (5th Cir.1961), *cert. denied,* 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961), but here there was no murder. As is apparent there was only an "agreement" to murder. After Rodriguez informed the state and the FBI and acted as an informant there was no actual threat that the "conspiracy" would be carried out.

Villanueva's theory travels upon a premise that the requisite deprivation can be maintained by this showing of conspiracy. We find the premise to be flawed. Under § 1983 conspiracy can furnish the conceptual spring for imputing liability from one to another. *Ryland v. Shapiro,* 708 F.2d 967, 974 (5th Cir.1983); *Nesmith v. Alford,* 318 F.2d 110 (5th Cir.1963), *cert. denied* 375 U.S. 975, 84 S.Ct. 489, 11 L.Ed.2d 420 (1964). A conspiracy may also be used to furnish the requisite state action. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970). Yet, it remains necessary to prove an actual deprivation of a constitutional right; a conspiracy to deprive is insufficient. *Slavin v. Curry,* 574 F.2d 1256, 1261 (5th Cir.1978), modified on other grounds, 583 F.2d 779 (1978), overruled on other grounds, *Sparks v. Duval County Ranch Co.,* 604 F.2d 976, 978 (5th Cir.1979) (en banc), aff'd sub nom. *Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980); *Hanna v. Home Insurance Co.,* 281 F.2d 298, 303 (5th Cir.1960), *cert. denied,* 365 U.S. 838, 81 S.Ct. 751, 5 L.Ed.2d 747 (1961); *Reichenberger v. Pritchard,* 660 F.2d 280, 285 (7th Cir.1981); *Landrigan v. City of Warwick,* 628 F.2d 736, 742 (1st Cir.1980); *Hampton v. Hanrahan,* 600 F.2d 600, 624–5 (7th Cir.1979), rev'd as to another issue, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980); *see also Mansell v. Saunders,* 372 F.2d 573, 576 (5th Cir.1967). Here Villanueva has failed to show any such deprivation. Without a deprivation of a constitutional right or privilege, McInnis has no liability under § 1983.

That the agreement between McInnis and Rodriguez was illegal or even "unconstitutional" in an abstract sense such as might be posed by a *quo warranto* inquiry does not answer the question raised by this private suit for money damages. We are unable to identify in this inchoate "agreement" an actual *deprivation* of any consti-

tutional right of Villanueva.[3] Villanueva's argument that he has a constitutional right to be free of a conspiracy to murder begs the question of deprivation. While Villanueva's liberty or life interests may for a brief period have been sufficiently threatened to warrant injunctive relief the distance to a deprivation of liberty or life was here too great to lend definition to the constitutional right allegedly lost. Implicit in a deprivation is both a defined right and a loss. Stated differently and in sum this claimant has proved no loss of constitutional right.

Because we find Villanueva's failure to prove a constitutional deprivation dispositive, we do not address the color of state law issue or consider McInnis's other claims.

Judgment REVERSED.

---

**3.** Under 18 U.S.C. § 241 it is a crime "to conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution." We do not suggest that there was a loss of constitutional right without monetary loss. Such a deprivation would support nominal damages, *Ryland v. Shapiro*, 708 F.2d 967, 976 (5th Cir.1983) and put punitive damages at issue.