Accordingly, for all of the foregoing reasons, the judgment of the district court, is AFFIRMED.

Irvin **KAPLAN**, Plaintiff-Appellant,

v.

**CLEAR LAKE CITY WATER AUTHORITY**, City of Taylor Lake Village, Frank Burnett, Individually and as General Manager of Clear Lake City Water Authority, Marta Greytok, Individually and as Mayor of City of Taylor Lake Village, Defendants-Appellees.

No. 85–2728.

United States Court of Appeals, Fifth Circuit.

July 23, 1986.

---

Charles R. Huber, Jr., Robert L. Burns, Houston, Tex., for plaintiff-appellant.

William E. Schweinle, Jr., Leonard, Koehn & Hurt, Reginald H. Wood, Bellaire, Tex., for Clear Lake and Burnett.

Barry Abrams, Sewell & Riggs, Houston, Tex., for City of Taylor and Greytok.

Before RUBIN, POLITZ and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

Plaintiff-appellant Irvin Kaplan appeals from the district court's entry of summary judgment in favor of defendants-appellees Clear Lake City Water Authority, Frank Burnett, the City of Taylor Lake Village, and Marta Greytok. Kaplan alleged in his complaint that the defendants conspired to prevent Kaplan from constructing multi-family housing on a thirty acre parcel of land by preventing Kaplan from obtaining water and sewer services for the property, and that in so conspiring, the defendants violated the federal antitrust laws, the federal civil rights laws, the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States, and Texas law. This Court concludes that the district court properly granted summary judgment, and the judgment of the district court is affirmed.

## I. FACTS AND PROCEDURAL HISTORY

The Clear Lake City Water Authority ("the Water Authority") is a political subdivision of the state of Texas, *see* Tex. Const.

art. XVI, § 59; Tex.Rev.Civ.Stat.Ann. arts. 8280–280, 717r, which consists of a water control and improvement district located near Houston, Texas. The Water Authority provides water and sanitary sewer services to the area within its boundaries, and it also provides those services to some areas outside its boundaries. On December 12, 1978, the Water Authority instituted a moratorium on service to any new multi-family residential development until a new sewage treatment plant was constructed. The new plant became operational in April of 1983, and the moratorium was lifted at that time.

Irvin Kaplan ("Kaplan") owns thirty acres of undeveloped land located entirely within the City of Pasadena, Texas, and adjacent to defendant City of Taylor Lake Village ("Taylor Lake").[1] The Water Authority provides water and sewer services to Pasadena pursuant to a written contract as an "outside" customer, while part of Taylor Lake is served as an "inside" customer. As a result, the Water Authority provides water and sewer service to all land surrounding Kaplan's property.

Kaplan first requested water and sewer service for the tract in May of 1979. The Water Authority denied that request assertedly on the basis of the moratorium. In response to Kaplan's inquiries, Frank Burnett, the general manager of the Water Authority, informed Kaplan that Kaplan must consult with Taylor Lake concerning his request for service.[2] Burnett also informed the Water Authority's board of directors that he had indicated to Kaplan that Kaplan should contact Taylor Lake "to see if his proposed construction fits harmoniously with their plans."[3] Burnett updated the Board in October of 1981 advising the Board that Kaplan's previous request for service on the thirty acre tract was denied on the basis of the moratorium, but that Burnett needed the Board's position because the new treatment plant was near completion. The Board determined that it would not approve service to any development of which Taylor Lake disapproved.[4]

Burnett informed Marta Greytok, Taylor Lake's Mayor, of the Board's position by letter. Greytok Deposition, Exhibit 5. Mayor Greytok in turn reported these developments to the Taylor Lake City Council on November 4, 1981, indicating that "she had sent a letter to the potential developer stating Council's wishes that this property only be developed as single-family residential."[5] Greytok Deposition, Exhibit 6. On June 2, 1982, Kaplan personally appeared before the Taylor Lake City Council and presented his development plans for the subject property. The City Council subsequently refused to support his proposed development.

After completion of the new treatment plant, the Water Authority again denied

1. In August of 1979, during the course of the moratorium, Kaplan sold the thirty acre tract to Clear Lake Associates, a California partnership, for development as multi-family housing. The sale contract provided, however, that Clear Lake Associates had the right to reconvey the land to Kaplan in the event that utilities were not available to the tract within three years. Eventually, Clear Lake Associates exercised this right and reconveyed the land to Kaplan.

2. Kaplan's deposition testimony indicated that Burnett stated, "[W]hat you need to do is go see Marta Greytok [the Mayor of Taylor Lake] because without her approval we won't issue any utilities for that property." Kaplan Deposition at 46–47.

3. Burnett Deposition, Exhibit 92 (Minutes of May 27, 1981, Clear Lake City Water Authority Board of Directors' Meeting).

4. Greytok Deposition, Exhibit 8 (Minutes of October 22, 1981, Clear Lake City Water Authority Board of Directors' Meeting).

5. The letter to Kaplan's attorney indicated that Taylor Lake desired low density housing in the area because

a large amount of the land in this area is in the flood plain, [and] our engineers recommended we structure our zoning ordinance for low density housing with large lots. * * * The high density development you propose would significantly add to our civil defense and evacuation problems, during times of high water.

Greytok Deposition, Exhibit 6 (attachment).

Kaplan service. The Water Authority asserts that it denied service because the new treatment plant was built with funds obtained from the Environmental Protection Agency (EPA), and the EPA grant prohibited the Water Authority from providing service to land within the 100–year flood plain. Because there was some concern that Kaplan's land fell within the 100–year flood plain, and because the penalty for noncompliance was forfeiture of the EPA grant, the Water Authority determined that it should not grant Kaplan service until the status of Kaplan's land was resolved.

In addition, both the Water Authority, through Burnett, and Taylor Lake, through Mayor Greytok, opposed Kaplan's efforts to provide his own utilities for the thirty acre tract. Mayor Greytok and Burnett participated in administrative hearings before (1) the Texas Department of Water Resources in opposition to Kaplan's application for a sewage treatment plant permit, and (2) the Harris-Galveston Coastal Subsidence District in opposition to Kaplan's request for a water well permit. The stated reason for opposition to the water well permit was that Kaplan's proposed well would aggravate existing subsidence problems in the area. The Coastal Subsidence District denied the application for a water well permit, although Kaplan successfully obtained a permit to construct his own 200,-000 gallon per day sewage treatment facility.

In what appears to be an attempt to resolve the conflict, the Coastal Subsidence District requested the Water Authority to provide service to Kaplan. The Water Authority passed a proposal to provide service to Kaplan in the amount of 40,000 gallons per day. The offer remains open; Kaplan has not accepted it because his proposed multi-family development requires 200,000 gallons per day.

On August 16, 1983, Kaplan instituted the instant action alleging violations of the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution, the federal civil rights laws, and Texas law, based on an alleged conspiracy by the defendants to prevent development of multi-family residential housing in the Clear Lake City area by refusing to provide water and sewer service to Kaplan's land. On March 26, 1985, by permissive amendment, Kaplan added an antitrust claim, 15 U.S.C. §§ 1, 15. Kaplan sued both Burnett and Mayor Greytok in their individual and official capacities. All defendants moved to dismiss or for summary judgment. The district court granted the motions, and Kaplan now appeals. For the following reasons, this Court affirms the judgment of the district court.

## II. DISMISSAL OF THE ANTITRUST CLAIMS UNDER THE LOCAL GOVERNMENT ANTITRUST ACT OF 1984

█ As an initial matter, the district court applied the Local Government Antitrust Act of 1984 to bar Kaplan's antitrust claims against all defendants. The Act provides:

No damages, interest on damages, costs, or attorney's fees may be recovered under section 15, 15a or 15c of this title from any local government, or official or employee thereof acting in an official capacity.

15 U.S.C. § 35(a). The Act became effective on September 24, 1984, and it provides:

Subsection (a) of this section shall not apply to cases commenced before the effective date of this Act unless the defendant establishes and the court determines, in light of all the circumstances, including the stage of litigation and the availability of alternative relief under the Clayton Act, that it would be inequitable not to apply this subsection to a pending case. In consideration of this section, existence of a jury verdict, district court judgment, or any stage of litigation subsequent thereto, shall be deemed to be prima facie evidence that subsection (a) of this section shall not apply.

15 U.S.C. § 35(b). This Court affirms the district court's determination that it would

be inequitable not to apply the statute to bar Kaplan's claims.

In addition to the two specific factors enunciated in the statute, the statute cautions that the district court must consider *all* of the circumstances appropriate to resolution of the retroactivity issue.[6] Each of the relevant circumstances presented in the instant case weighs in favor of retroactive application.

First, pretrial discovery was ongoing at the time the defendants moved to dismiss under the Act. "[W]here discovery is continuing, courts have almost universally applied the Act to cases pending prior to its effective date." *Pontarelli*, 623 F.Supp. at 283; *see Woolen*, 615 F.Supp. at 352; *Jefferson Disposal Co. v. Parish of Jefferson*, 603 F.Supp. 1125, 1132–33 (E.D.La.1985).

Second, although Kaplan does not seek injunctive relief, injunctive relief under the Clayton Act nevertheless would be available and would offer partial relief to Kaplan, assuming that Kaplan prevailed on his antitrust claims. Although injunctive relief would not compensate Kaplan for his financial losses, it would prevent the Water Authority from illegally denying him utilities to his property in the future. Kaplan asserts that such relief only duplicates the relief already obtained, i.e., a permit to construct his own sewage treatment facility. Kaplan's contention, however, does not address the difference in cost between obtaining sewage treatment from the Water Authority and constructing his own facilities. Moreover, it fails to address at all the

fact that Kaplan has yet to obtain a water supply. Thus, we conclude that the second statutory factor also weighs in favor of retroactive application of the Act. *See Pontarelli*, 623 F.Supp. at 283; *Woolen*, 615 F.Supp. at 352; *Miami International*, 607 F.Supp. at 454; *Jefferson Disposal*, 603 F.Supp. at 1133–35.

Finally, although Kaplan's case was pending at the time of the passage of the Act, Kaplan did not amend his complaint to assert his antitrust claims until six months after the effective date of the Act. Kaplan concedes that he knew the factual basis for his antitrust claims at the time he filed his original complaint. Thus, the unexcused late addition of Kaplan's antitrust claims constitutes another circumstance that the district court appropriately considered in determining that it would be inequitable not to apply the Act to bar Kaplan's claims. The district court did not err in so holding.

## III. KAPLAN'S SUBSTANTIVE DUE PROCESS AND EQUAL PROTECTION CLAIMS

Kaplan asserts that the defendants' actions deprived him of substantive due process and equal protection under the Fourteenth Amendment. In a nutshell, Kaplan argues that he was denied substantive due process because Texas statutory and decisional law provides him with a property right in obtaining utility service from the Water Authority *in the amount he requested*,[7] and the Water Authority's refusal to provide that service for reasons be-

---

**6.** In light of this language, most district courts have concluded that the two statutory factors are not exclusive. *See, e.g., Woolen v. Surtran Taxicabs, Inc.*, 615 F.Supp. 344, 351 (N.D.Tex. 1985); *Miami International Realty Co. v. Town of Mt. Crested Butte*, 607 F.Supp. 448, 452 (D.Colo.1985) ("The explicit language of the statute, however, provides that these two [statutory] factors are not exclusive."). Some district courts have suggested consideration of three additional factors: (1) the financial harm that a treble damage award would inflict on a municipality and its taxpayers, (2) whether the municipal action was predicated on or in furtherance of state or federal laws, and (3) whether the municipality acted in good faith in the discharge of its normal legislative, regulatory, executive, administrative, or judicial authority.

*See, e.g., Pontarelli Limousine, Inc. v. City of Chicago*, 623 F.Supp. 281, 283 (N.D.Ill.1985); *Woolen*, 615 F.Supp. at 351; *Miami International*, 607 F.Supp. at 454.

**7.** Kaplan claims that he was deprived of property without due process of law because, under Texas law, the Water Authority has a mandatory duty to provide him with water and sewer service *in the amount requested*. We emphasize that Kaplan claims much more than a right to service; he claims a right to as much service as he desires. Whether Kaplan has demonstrated a property interest as extensive as that claimed is a difficult question of state law which this Court need not decide given that *Shelton* clearly governs the facts of this case.

yond its governmental authority violated the Fourteenth Amendment. In addition, Kaplan asserts that the Water Authority's decision to impose a moratorium on service to multi-family housing and its decision to deny him service while providing service to other outside customers denied him equal protection.

This Court concludes that Kaplan's claims must fail under this Court's recent en banc decisions in *Shelton v. City of College Station*, 780 F.2d 475 (5th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 3276, 91 L.Ed.2d 566 (U.S.1986), and *Stern v. Tarrant County Hospital District*, 778 F.2d 1052 (5th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986). The former case controls Kaplan's substantive due process claim, and the latter case controls his equal protection claims.

Initially, Kaplan attempts to distinguish *Shelton* arguing that the state constitutional and statutory scheme under which the Water Authority operates does not give it any legislative powers or discretion "to make decisions about who is going to get service today and who is going to get service tomorrow." Recent Texas Supreme Court precedent as well as the statute creating the Water Authority do not support this categorical statement.

Although the governmental powers of the Water Authority are undoubtedly limited, and do not encompass the full range of police powers including zoning power, the Texas Supreme Court has made clear that one of the governmental powers the Water Authority does enjoy "is the determination of whether, on any particular date, it is in the best interests of all its customers and the public in general, to extend water and sewer service to a particular person or entity." *Clear Lake City Water Authority v. Clear Lake Utilities Co.*, 549 S.W.2d 385, 392 (Tex.1977). Moreover, the statute creating the Water Authority clearly contemplates that the Water Authority has the power to contract with property owners and to purchase and construct improvements as "appropriate to a *continuing and*

*orderly plan of development* ... so that, to the greatest extent reasonably possible, considering sound engineering and economic practices, all such lands may, under such contracts, be placed in position *ultimately* to receive ... services...." Tex.Rev.Civ. Stat.Ann. art. 8280–280 § 9 (emphasis added). Contrary to Kaplan's assertion, the Water Authority does possess limited power to determine who gets services and when, although the statute places restrictions on the exercise of that power by indicating that sound engineering practices, economics, and orderly development are considerations which enter into the decisionmaking process.

■ Recognizing, as has Texas law, that the Water Authority is required to act in "the best interests of all its customers," this Court is led to the conclusion that the Water Authority does indeed possess limited legislative or quasi-legislative functions. That conclusion, in turn, indicates that *Shelton,* and the standard there articulated, governs this case:

> *[F]ederal judicial interference* with a state zoning board's quasi-legislative decisions, like invalidation of legislation for "irrationality" or "arbitrariness," *is proper only if the governmental body could have had no legitimate reason for its decision.*

780 F.2d at 483 (emphasis added).

The Water Authority asserts that it denied Kaplan service first because of the moratorium and second because of EPA grant restrictions. Both of these reasons are legitimate reasons well within the power of the Water Authority. The moratorium was enacted in light of a capacity problem. That capacity problem was solved by construction of a new sewage treatment facility which the Water Authority financed through an EPA grant. Certainly, the allocation of limited capacity and the method by which new capacity is funded fall squarely within those types of legislative decisions committed to the Water Authority.

It is immaterial that Kaplan offers to demonstrate that those articulated reasons were pretextual. As stated in *Shelton:*

> We do not suggest that a zoning decision can be justified by mouthing an irrational basis for an otherwise arbitrary decision.... The key inquiry is whether the question is "at least debatable." [citation omitted]. If it is, there is no denial of substantive due process as a matter of federal constitutional law.

780 F.2d at 483.

■ Likewise, Kaplan's equal protection claim fails under this Court's decision in *Stern*. Kaplan challenges the Water Authority's moratorium on the basis that it was not rational to limit service to multi-family housing when in fact serving multi-family housing would generate increased tax revenue. In *Stern*, this Court stated:

> In equal protection terms, if the legislative purpose be legitimate, [an equal protection] challenge "may not prevail so long as the question of rational relationship [to legislative purpose] is 'at least debatable.'" When a legislature has a choice of means, each rationally related to its legislative purpose, it may constitutionally choose any of them. Its choice of one does not render the others irrational.... The constitutional test for rationality of a legitimate classification, whether the classes be distinguished in the text of the law or in its administration, is whether *any* rational decisionmaker could have so classified.

778 F.2d at 1056 (emphasis in original, first bracketed material added, second bracketed material in original, citations omitted).

In support of its decision to place a moratorium on multi-family housing and not on commercial or single-family development, Burnett stated that the Board "wanted some continued growth. So they would still listen to applications for smaller users, rather than to large users." Further, "[b]y allowing commercial growth which uses

less [ ] [sewer] capacity, ... than others, we could still enhance our tax base and at the same time [ ] continue service to small single families, too." Burnett Deposition at 92–93. Although Burnett conceded that five acres of multi-family development would enhance the tax base more than five acres of single family development, *id.*, this Court cannot conclude that a rational decisionmaker could not determine that the choice of a moratorium on multi-family housing better served the interests of *all* of the Water Authority's customers than some other blend of restrictions.[8]

For these reasons, Kaplan's claims fail to rise to the level of either a substantive due process or equal protection violation. The district court properly entered summary judgment against Kaplan on his constitutional and civil rights claims.

## IV. KAPLAN'S CONSPIRACY CLAIMS

■ This Court's holding that the district court properly granted defendants' motion for summary judgment on Kaplan's federal constitutional claims likewise disposes of his claim of conspiracy between Taylor Lake and the Water Authority under section 1983. As this Court recently stated:

> "Under § 1983 conspiracy can furnish the conceptual spring for imputing liability from one to another.... A conspiracy may also be used to furnish the requisite state action.... Yet it remains necessary to prove an actual deprivation of a constitutional right; a conspiracy to deprive is insufficient.... Here [the plaintiff] has failed to show any such deprivation. Without a deprivation of a constitutional right or privilege, [the defendant] has no liability under § 1983."

*Farrar v. Cain*, 756 F.2d 1148, 1151 (5th Cir.1985) (brackets and elipses in original, footnote omitted) (quoting *Villanueva v. McInnis*, 723 F.2d 414, 418 (5th Cir.1984) (citations omitted)).

8. As to Kaplan's claim that the Water Authority has treated him differently than other similarly situated parties, Kaplan totally failed to demonstrate that the Water Authority granted service to any other developments outside the jurisdictional boundaries of the Water Authority since the lifting of the moratorium.

## V. IMMUNITY

■ Kaplan sued Burnett and Greytok in their individual capacities. This Court agrees with the district court's conclusion that both Burnett and Greytok are entitled to qualified immunity.

In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed. 396 (1982), the Supreme Court enunciated an objective test for the determination of qualified immunity in order to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." 457 U.S. at 818, 102 S.Ct. at 2738. The Court articulated the following standard:

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

457 U.S. at 817–18, 102 S.Ct. at 2738 (citations and footnote omitted).

Although we assumed, without deciding, that Kaplan's interest in obtaining water and sewer service for his property *in the amount requested* rose to the level of a protectable property interest in order to expeditiously resolve Kaplan's substantive due process claim, see *supra* note 7, we agree with the district court that Kaplan's argument that he is not only entitled to service, but to service in the amount he requests, alleges a "unique and broadening application of state law as the basis for his Constitutional claims and the purported violation of his civil rights." Record Vol. 1 at 26. Consequently, in light of this troubling and difficult question of whether Texas law creates such a property right, this Court concludes that the actions of defendants Greytok and Burnett did not violate any "clearly established statutory or constitutional rights" of Kaplan's. This conclusion is further supported by Kaplan's concession that each action taken by Grey-

tok and Burnett had a legitimate basis and was not itself unlawful. For these reasons, and the further reasons articulated by the district court, this Court concludes that Greytok and Burnett were both entitled to qualified immunity.[9]

## VI. THE DISMISSAL OF KAPLAN'S PENDENT STATE CLAIMS

■ Finally, Kaplan argues that the district court erroneously dismissed Kaplan's pendent state claims. This Court disagrees. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), emphasizes that merely because the federal court has the jurisdiction or power to hear a state law claim does not mean that the district court must exercise that power. 383 U.S. at 726, 86 S.Ct. at 1139. Moreover, *Gibbs* cautions that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surefooted reading of applicable law." 383 U.S. at 726, 86 S.Ct. at 1139 (footnote omitted).

In the instant case, given the district court's disposition of Kaplan's federal claims, and this Court's affirmance of the district court's judgment, the only remaining issues are issues of state law. As noted, those issues are unique and not readily resolved. Thus, we find no abuse of discretion in the district court's dismissal of those claims in order to avoid a needless decision of state law. Considerations of judicial economy, convenience, and fairness to the litigants do not command a different result in this case.

## VII. CONCLUSION

For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**

---

**9.** The conclusion that Greytok and Burnett are both entitled to qualified immunity makes it unnecessary to address the contentions that Greytok's actions are shielded by absolute immunity and further shielded by the Noerr-Pennington Doctrine.

ALVIN B. RUBIN, Circuit Judge, concurring.

Because this panel is bound by the en banc decisions of the court in *Shelton v. City of College Station*, 780 F.2d 475 (5th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986), and *Stern v. Tarrant County Hospital District*, 778 F.2d 1052 (5th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986), I concur. Such a summary dismissal of claims of denial of constitutional rights is the inevitable result of those decisions.