United States Court of Appeals,

Fifth Circuit.

No. 96-20297.

BAY COLONY, LTD., Plaintiff-Appellant,

v.

TRENDMAKER, INC., Midlands Associates, & Weyerhaeuser Real Estate
Company, Defendants-Appellees,

and

 Federal Deposit Insurance Corporation, as Receiver for
Commonwealth Federal Savings Association, Intervenor Defendant-
Appellee.

Sept. 17, 1997.

Appeals from the United States District Court for the Southern
District of Texas.

Before KING and PARKER, Circuit Judges, and ROSENTHAL[*], District
Judge.

PER CURIAM:

The Appellant, Bay Colony, Ltd. appeals from the district

court's grant of judgment as a matter of law for the Appellees,

Trendmaker, Inc., Midlands Associates, and Weyerhaeuser Real Estate

Company, following the jury's verdict for Bay Colony.  Finding no

error, we affirm.

*FACTUAL BACKGROUND*

Bay Colony, Ltd. ("Bay Colony") was formed in 1985 as a

limited partnership by Robert Brackman ("Brackman") for the purpose

---

[*]District Judge of the Southern District of Texas, sitting by
designation.

1

of purchasing certain real estate which forms the basis of this suit. Brackman is an attorney and an experienced real estate investor who had organized and served as general partner for several Texas real estate partnerships.

Trendmaker, Inc. ("Trendmaker") was an entity involved in real estate development. Weyerhaeuser Real Estate Company ("WRECO") was the parent company of Trendmaker. In March 1985, Trendmaker and Commonwealth Realty Development, Inc. ("Commonwealth Realty") formed Midlands Associates ("Midlands"), a Texas joint venture. Commonwealth Realty is a wholly-owned subsidiary of Commonwealth Federal Savings Association ("Commonwealth Savings") which is in receivership with the Resolution Trust Corporation.

On March 25, 1985, Midlands purchased approximately 883 acres of property located in Galveston County, Texas. The property, known as the Bay Colony Property, was purchased for the purpose of developing a master planned community. The idea was that Commonwealth Savings would provide the financing and Trendmaker would contribute its real estate expertise toward development of the property. Midlands purchased the raw land for a total price of over $13 million, partially financed by the sellers. Midlands borrowed another $25.3 million from Commonwealth Savings which funded the construction obligations undertaken on the residential areas as well as the commercial reserves.[1] These loans were

---

[1] A commercial reserve is land reserved for commercial use.

secured by the property and the guarantees of Trendmaker, Commonwealth Realty, and Midlands.

In the summer of 1985, Brackman was approached by two real estate brokers about investing in the Bay Colony master-planned community which was in the initial stages of development. Brackman met with Trendmaker officials several times during that summer concerning the project and his interest in purchasing the commercial reserves of the planned community.

According to Brackman, Trendmaker's representatives stated that they were a subsidiary of WRECO, a six-billion dollar corporation, and that Trendmaker was committed to the project and was going to fully develop the master-planned community. Brackman also stated that Trendmaker's representatives told him that Trendmaker would be there from start to finish, "cradle to grave," and that if there were any problems in development Trendmaker would be the builder if necessary, and finally that WRECO was committed to the deal. There are no written documents corroborating Brackman's testimony. Although Brackman dealt with representatives of Trendmaker, he understood that the transaction would be made through Midlands.

In October, 1985, Bay Colony (acting through Mr. Brackman, its general partner) and Midlands executed an earnest money contract for the purchase of thirteen tracts (consisting of 74 acres) of commercial reserves in the master-planned community. The earnest money contract gave Brackman a 90-day "Feasibility Study" time

period in which Brackman could evaluate the deal, terminate the deal and demand the return of his earnest money. The earnest money contract also contained an entirety clause, which stated, "This Contract is the entire Contract between the Seller and Purchaser ... and no modification hereof or subsequent agreement ... shall be binding on either party unless reduced to writing and signed by both parties." On December 13, 1985, Bay Colony and Midlands closed the transaction. Bay Colony made a cash payment of over one million dollars and executed thirteen separate promissory notes and Deeds of Trust for the balance of the purchase price which was slightly over four million dollars.

As part of the transaction, Midlands agreed to perform various "construction obligations" on the thirteen tracts of land purchased by Bay Colony. Pursuant to these construction obligations, Midlands agreed to substantially complete certain streets, landscaping and irrigation, install pump lines for storm sewer and surface drainage, and remove any of the thirteen tracts which were in the flood plain from the flood plain. Three contracts contained these construction obligations: (1) the earnest money contract; (2) the escrow agreement; (3) the thirteen Deeds of Trust. Both the escrow agreement and the earnest money contract afforded Bay Colony limited options if Midlands failed to perform the construction obligations.

Brackman testified that he had no quarrel with the efforts Trendmaker was putting into the master-planned community during

4

1986.  Trendmaker was performing the construction obligations on the commercial reserves, it was installing sewer and water lines, underground utilities, detention ditches, streets, and other grading and landscaping for the proposed residential tracts.  By the end of 1987, Midlands had an outstanding debt of over $37 million with Commonwealth Savings.

However, during 1986, several disasters occurred.  In January 1986, the space shuttle Challenger exploded (the Bay Colony project was located near NASA's Johnson Space Center).  The price of oil fell by over 50%, and the Tax Reform Act of 1986 severely restricted the use of real estate tax shelters, thus drying up investment money.  Moreover, with the crash of the real estate market, financial troubles developed on both sides.  Bay Colony failed to make its first payment on the notes as scheduled, on December 13, 1986.  On December 19, 1986, Bay Colony made a payment of $379,745.55, and the parties modified the due dates of the 1986 and 1987 payments and certain performance dates of Midlands.  According to the amended agreement, the 1988 payments were to be made as provided in the original notes.  Subsequently, Bay Colony failed to make its next set of payments due on June 13, 1987.  Trendmaker/Midlands did not give notice of the default because they were behind schedule on their construction obligations, and they were waiting to see if Brackman's group would pay the arrears on the contract before completing additional work pursuant to the construction obligations.

5

With financial difficulties on both sides, the parties entered into further negotiations to modify the note and liens. On March 11, 1988, the parties executed the Second Modification of Real Estate Note and Liens, which was to be effective retroactive to June 13, 1987, the date the payment was first due. On this date, Bay Colony also paid $420,465.32 to Midlands for the June 13, 1987 and the December 13, 1987 payments on the Notes. The March 1988 payment was the last payment Bay Colony made on its contractual obligation.

Brackman testified that soon after making the payment on March 11, 1988 to Midlands, he heard a rumor that Trendmaker might be withdrawing from the Bay Colony development project. Brackman stated that he contacted Mr. William Dalton, Jr., Vice President of Trendmaker, and was told that Trendmaker had not withdrawn from the project, but if it did withdraw, Trendmaker would be replaced in the joint venture by a developer which was at least the equal of Trendmaker.

However, the relationship between the joint venturers of Midlands was deteriorating. Commonwealth Savings was in severe financial difficulty, and Trendmaker had become unhappy dealing with the "decision by committee" management style of its joint venturer Commonwealth Realty. Thus, on December 29, 1987, Trendmaker proposed that it and Commonwealth Realty split up the two joint ventures in which they were involved and go their separate ways. Commonwealth Realty failed to respond to this

proposal until March 18, 1988, one week after Brackman had paid the June and December, 1987 contract installments. Discussions ensued between Trendmaker and Commonwealth Realty on dividing up their holdings. Brackman was not involved in, or informed of, these discussions. On May 18, 1988, Trendmaker transferred all of its interest in the Bay Colony master-planned community to Commonwealth Realty in exchange for Commonwealth Realty's interest in another project. Trendmaker remained on-site at the Bay Colony development as the contract manager until June, 1989.

Bay Colony failed to make its December 1988 payment. Although Brackman had not raised the entire amount due under the contract, he testified that he did not make the payment because he became aware between March and December 1988, that Commonwealth Realty and its parent Commonwealth Savings were in a precarious financial condition, and that Commonwealth Savings could not loan additional monies to the development. Midlands eventually foreclosed on all thirteen tracts and Bay Colony was left with nothing to show for its investment of over two million dollars.

Bay Colony filed suit in state court and the Resolution Trust Corporation removed to federal court. The district court granted summary judgment in favor of Trendmaker on Bay Colony's breach of contract, negligence, breach of good faith and fair dealing, and statutory and common law fraud claims. Bay Colony proceeded to trial on its Deceptive Trade Practices Act and fraud by omission claims against Trendmaker, and its alter ego theory of liability

7

against WRECO.

Following the close of Bay Colony's case-in-chief, the district court granted WRECO's motion for a directed verdict on Bay Colony's alter ego theory as a basis to pierce the corporate veil between WRECO and Trendmaker. Trendmaker and Midlands also moved for a directed verdict on Bay Colony's fraud by omission and deceptive trade practices act claims, arguing that Bay Colony failed to present any evidence necessary to establish its claims. However, the district court took this motion under advisement. Thereafter, Trendmaker and Midlands presented their evidence. Bay Colony presented no rebuttal evidence. Trendmaker and Midlands did not reurge their motion for directed verdict at the close of all the evidence, although they did timely object to the proposed jury charge based on no evidence or insufficient evidence for the case to proceed to the jury. These objections were overruled.

The jury found for Bay Colony on its fraud and DTPA claims, and awarded Bay Colony attorneys' fees under the DTPA. Following the verdict, Trendmaker and Midlands moved for judgment as a matter of law under Rule 50(b) arguing that there was no evidence or insufficient evidence to support the jury's verdict. The district court entered judgment as a matter of law for Trendmaker and Midlands, concluding that the jury's verdict was based on speculation and conjecture, and could not be sustained. Bay Colony timely appealed to this Court.

*DISCUSSION*

On appeal, Bay Colony asserts six issues for this Court's consideration. However, because we affirm the lower court's judgment with respect to its granting judgment as a matter of law on Bay Colony's fraud by omission and DTPA claims against Trendmaker and Midlands, we conclude that the remaining issues are moot.

*A. Motion for Judgment as a Matter of Law*

Bay Colony asserts that the district court erred in granting judgment as a matter of law in favor of Trendmaker and Midlands because Trendmaker and Midlands did not satisfy Fed.R.Civ.P. 50(b). In particular, Bay Colony argues that at the close of all the evidence in the case, no party made a motion for judgment as a matter of law under Rule 50(b). Thus, Bay Colony argues that under Rule 50(b), the proper evidentiary review standard is whether there was *any* evidence to support the verdict. Bay Colony also contends that even a timely motion for directed verdict could not support a judgment as a matter of law unless the motion specifically pointed out how the evidence was insufficient on its claims. Trendmaker and Midlands counter that their motion for directed verdict under Rule 50(a) and their objections to the jury charge satisfied the requirements for Rule 50(b).

Generally, a party who fails to renew his motion for directed verdict at the close of all the evidence waives his right to

9

challenge the sufficiency of the evidence. *Scottish Heritable Trust v. Peat Marwick Main & Co.,* 81 F.3d 606, 610 (5th Cir.), *cert. denied,* --- U.S. ----, 117 S.Ct. 182, 136 L.Ed.2d 121 (1996). However, "[t]his Court has repeatedly emphasized that the application of Rule 50(b) should be examined in the light of the accomplishment of [its] particular purpose[s] as well as in the general context of securing a fair trial for all concerned in the quest for truth." *McCann v. Texas,* 984 F.2d 667, 671 (5th Cir.1993) (quoting *Bohrer v. Hanes Corp.,* 715 F.2d 213, 217 (5th Cir.1983)). Thus, this Court has not required strict compliance with Rule 50(b) and has excused technical noncompliance where the purposes of the requirements have been satisfied. *Scottish Heritable Trust,* 81 F.3d at 610; *Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc.,* 735 F.2d 884 (5th Cir.1984); *Villanueva v. McInnis,* 723 F.2d 414 (5th Cir.1984). The two basic purposes of Rule 50(b) are "to enable the trial court to re-examine the question of evidentiary insufficiency as a matter of law if the jury returns a verdict contrary to the movant, and to alert the opposing party to the insufficiency before the case is submitted to the jury." *MacArthur v. University of Texas Health Ctr. at Tyler,* 45 F.3d 890, 896-97 (5th Cir.1995). However, a party may not base a motion for judgment [as a matter of law] on a ground that was not included in a prior motion for directed verdict. *Jones v. Benefit Trust Life Ins. Co.,* 800 F.2d 1397, 1401 (5th Cir.1986); *McCann v.*

10

*Texas City Refining, Inc.,* 984 F.2d 667, 672 (5th Cir.1993); *Guilbeau v. W.W. Henry Co.,* 85 F.3d 1149, 1160-61 (5th Cir.1996) (holding that although defendant's motion under Rule 50 could have been more specific, it was adequate to preserve the issue of sufficiency of the evidence).

Where, however, the defendant failed to move at the close of all the evidence for judgment as a matter of law, this Court has concluded that if a defendant has made a motion for directed verdict at the close of the plaintiff's case for no evidence or insufficient evidence on specified grounds, and objects on those same grounds to the jury charge, this suffices to support a motion for judgment as a matter of law under Rule 50(b) on those grounds. *Purcell v. Seguin State Bank & Trust Co.,* 999 F.2d 950, 956 (5th Cir.1993) (citing *Villanueva,* 723 F.2d at 417-18); *Scottish Heritable Trust v. Peat Marwick Main & Co.,* 81 F.3d 606 (5th Cir.1996) (a defendant's objections to proposed jury charge on grounds pertaining to the sufficiency of evidence issues satisfies the requirements for a Rule 50(b) motion); *Hinojosa v. City of Terrell,* 834 F.2d 1223, 1228 (5th Cir.1988) (court may grant judgment as a matter of law where defendant made motion for directed verdict and objected to the court's jury instructions on grounds that there was no evidence to support a claim). Based on Trendmaker's motion for directed verdict at the close of Bay Colony's case-in-chief and Trendmaker's objections to the proposed

11

jury charge, we are convinced that the purposes of Rule 50(b) have been satisfied. Trendmaker's motion for directed verdict on Bay Colony's DTPA and fraud claims asserted that there was no evidence or insufficient evidence for the issue to go to the jury. Likewise, Trendmaker's objections to the jury charge contended that there was not any evidence to support submitting any part of Bay Colony's DTPA or fraud claim to the jury. Accordingly, we concluded that Trendmaker's objections to the jury charge were a sufficient approximation of its motion for directed verdict to support its later motion for judgment as a matter of law following the jury's verdict. *See, e.g., Villanueva v. McInnis,* 723 F.2d 414, 418 (5th Cir.1984).

*B. The Fraud by Nondisclosure & Deceptive Trade Practices Claims*

*1. Fraud by Nondisclosure*

The district court concluded that, as a matter of law, Trendmaker did not have a duty to disclose the negotiations between it and Commonwealth Realty prior to the time Bay Colony made its payment of $420,465.32 on March 11, 1988 to Trendmaker. On appeal, Bay Colony contends that Trendmaker had a duty to disclose its current intention to withdraw from the joint venture and that if Bay Colony knew of this intention, it would not have made the payment. Bay Colony asserts that the parties' past business conduct required the disclosure of such negotiations. We disagree.

Under Texas law, to assert a claim of fraud by nondisclosure,

12

the complaining party must prove, *inter alia,* a duty to disclose. *Chemetron Corp. v. Business Funds, Inc.,* 682 F.2d 1149, 1171-72 (5th Cir.1982), *judgment vacated on other grounds,* 460 U.S. 1007, 103 S.Ct. 1245, 75 L.Ed.2d 476 (1983).

Texas law recognizes a duty to disclose only where a fiduciary or confidential relationship exists. *Bernstein v. Portland Sav. & Loan Assn.,* 850 S.W.2d 694, 701 (Tex.App.—Corpus Christi 1993, writ denied) (citing *Tempo Tamers, Inc. v. Crow-Houston Four, Ltd.,* 715 S.W.2d 658, 669 (Tex.App.—Dallas 1986, writ ref'd n.r.e.)); *Southwest E & T Suppliers, Inc. v. American Enka Corp.,* 463 F.2d 1165, 1166 (5th Cir.1972) ("Texas law is clear that if there is no confidential or fiduciary relation between the parties [creating a duty to disclose], mere silence does not amount to fraud or misrepresentation.") There was no confidential or fiduciary relationship between the parties. Bay Colony did not act on behalf of Trendmaker or Midlands, nor did it have the authority to do so. Instead, Trendmaker and Bay Colony entered into an arms-length transaction for the sale of the commercial reserves and the later modifications of the real estate notes. The fact that parties have entered into a contract does not create a confidential relationship. *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 594 (Tex.1992). We conclude that under Texas law the contract between Bay Colony and Trendmaker does not constitute the type of special relationship necessary to create a

13

duty to disclose. *See, e.g., Lee v. Wal-Mart Stores, Inc.,* 34 F.3d 285, 290 n. 5 (5th Cir.1994) (the fact that people have had prior dealing with each other ... does not establish a confidential relationship).

*2. Deceptive Trade Practices Violation*

At trial, Bay Colony asserted three theories of liability under the Deceptive Trade Practices Act ("DTPA"), specifically, unconscionability, breach of warranty, and laundry list violations. In granting the judgment as a matter of law, the district court found that Bay Colony presented nothing more than possible breaches of contract or non-actionable puffing. We agree.

Bay Colony first contends that Trendmaker violated the DTPA by engaging in an unconscionable action or course of conduct. *See* Tex. Bus. & Com.Code § 17.45(5). Unconscionability can be premised on either of two types of conduct: (1) taking advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or (2) an act or practice resulting in a gross disparity between the value received and consideration paid in a transaction involving transfer of consideration. *Id*. Bay Colony's claim is based on the second ground. According to Bay Colony's expert testimony, the value of the commercial reserves was only $750,000 compared to the $5 million Bay Colony paid. Thus, there was a gross disparity in the consideration paid and the value received. However, Bay Colony ignores a basic tenet it must prove

14

in order to recover under the "gross disparity" unconscionability provision. Specifically, "the time for evaluating the disparity in value *is the time of sale.* Diminution in value caused by later events cannot support a claim of unconscionability." *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 441 (Tex.1995) (emphasis added). The record before us discloses that in January of 1986, Bay Colony obtained an appraisal of the property it had purchased the previous month. The appraisal estimated the value of the property at $9 million, over $4 million more than the purchase price. The fact that the appraisal was based in part on the assumption that the construction obligations would be fulfilled does not render the price paid unconscionable. Thus, we conclude that Bay Colony's purchase price was at market value in December 1985, and that there was no gross disparity in the consideration paid and value received.

Bay Colony next contends that Trendmaker is liable under the DTPA based on breach of warranty. In particular, Bay Colony asserts that the alleged statements made by Trendmaker and Midlands about their future conduct, i.e., Trendmaker would be the developer from start to finish; that the project would be developed in a timely fashion; that Trendmaker would complete the construction obligations; and that Trendmaker would remain involved in the project through completion, gave rise to an express warranty. We disagree.

15

Under the DTPA, a consumer may maintain an action for breach of an express warranty. *See* TEX. BUS. & COM.CODE § 17.50(a)(2). However, the DTPA does not create warranties; instead, to be actionable under the DTPA, warranties must be recognized by the common law or created by statute. *See La Sara Grain Co. v. First Nat'l Bank,* 673 S.W.2d 558, 565 (Tex.1984). Thus, in order for Bay Colony to prevail on its breach of warranty claim, it must show that during the course of its dealings with Trendmaker, Trendmaker represented express warranties and breached them.

First, the statements relied on by Bay Colony are not specific enough to allow judicial enforcement. Vague representations that a seller will help solve any problems that arise in the future have been held not actionable under the DTPA. *Charles E. Beard, Inc. v. McDonnell Douglas Corp.,* 939 F.2d 280 (5th Cir.1991). Second, Bay Colony expressly waived any warranties and representations not in the contract itself. The evidence of statements made during negotiations but not embodied in the contract cannot serve as the basis of a DTPA warranty claim, given that disavowal.

Finally, Bay Colony contends that Appellees committed "false misleading or deceptive" acts or practices, referred to as the "laundry list violations" under the DTPA. *See* Tex. Bus. & Com.Code § 17.46(b). The trial court submitted six of the twenty-five possible statutory bases for DTPA laundry list violations to the jury:

16

a. Causing confusion or misunderstanding as to the sponsorship, affiliation, connection or association of the real estate purchased; [§ 17.46(b)(2) ]

b. Causing confusion or misleading as to the affiliation, connection or association with another; [§ 17.46(b)(3) ]

c. Representing that the real property or related development services had the sponsorship, approval, characteristics, uses or benefits which it did not have; [§ 17.46(b)(5)]

d. Representing that the real estate or related development services were of a particular standard or quality when they were of another; [§ 17.46(b)(7) ]

e. Advertising real property with an intent not to sell it as advertised; [§ 17.46(b)(9) ]

f. Failing to disclose information concerning real property which was known at the time of a transaction, if such failure to disclose was intended to induce the purchaser into a transaction which the purchaser would not have entered had the information been disclosed. [§ 17.46(b)(23) ]

Bay Colony relies on essentially the same evidence as above, that is, Trendmaker's representations to Brackman during negotiations that Trendmaker would be the developer of the project from start to finish, that, with the backing of WRECO, it was committed to solving any problems that arose and that it would stay with the deal through the ups and downs of the market. Bay Colony argues that the evidence showed that Trendmaker never intended to put its own money into the project and that its commitment was conditioned on a minimum level of market stability, which reservations were never communicated to Bay Colony in violation of its obligations created under the DTPA. The evidence does not support Bay Colony's theory of DTPA laundry list liability. In fact, Appellees incurred obligations on notes totaling $37 million

17

in connection with the development before they were forced by the depressed economy to sacrifice the project. Even assuming that the jury could have inferred that the defendants should have put even more money into the project, the evidence would still not support a DTPA laundry list violation. The mere failure to perform a promise does not constitute a misrepresentation actionable under the DTPA unless it can be shown that at the time the promise was made, the promisor had no intentions of fulfilling the promise. *Kuehnhoefer v. Welch,* 893 S.W.2d 689, 693 (Tex.App.—Texarkana 1995, writ denied). The $37 million investment over three years forecloses a finding that Appellees misled Bay Colony as to their commitment to the project during negotiations.

*CONCLUSION*

Based on the foregoing, the judgment of the district court is AFFIRMED.

AFFIRMED.