Nabor ORTEGA, Aurelio Gonzalez, on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,

v.

Bill M. ROWE, Individually and as U.S. Border Patrol Agent, et al., Defendants-Appellees.

No. 85–1531.

United States Court of Appeals, Fifth Circuit.

Aug. 11, 1986.

Rehearing and Rehearing En Banc Denied Oct. 14, 1986.

Edward J. Tuddenham, Stephen C. McIntyre, Texas Rural Legal Aid, Inc., Hereford, Tex., Hoffman & Wheeler, Timothy L. Hoffman, Amarillo, Tex., for plaintiffs-appellants.

William Ken Johnson, John C. Ross, Jr., James P. Brewster, City Attys., Lubbock, Tex., for City of Lubbock and Henry.

Morris H. Deutsch, Allen W. Hausman, Dept. of Justice, Office of Immigration Lit., Civ. Div., Washington, D.C., for defendants-appellees.

Before GEE, POLITZ, and GARWOOD, Circuit Judges.

GEE, Circuit Judge:

Appellants in this class action challenge conditions that existed in jails used by the United States Border Patrol in the late 1970s and early 1980s to detain illegal aliens before deporting them. Alleging that detention did, or would, violate their due process rights, appellants seek both damages and injunctive relief from federal agents and local officials. We affirm the district court's judgment for appellees, concluding that, in the light of recent Supreme Court cases requiring due process violations to be based on more than government officials' mere negligence, the class failed to demonstrate the existence of unconstitutional behavior.

In summarizing the facts, we look to the district court's findings, which we deem to be plausible in light of the evidence presented. *See Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 1511, 84

L.Ed.2d 518, 528 (1985). We look especially to conditions in the Lubbock city jail, the primary facility used by the Border Patrol for these purposes. In 1977, the City of Lubbock began allowing the Border Patrol to house detainees in its jail. Later that year, the city ceased using the city jail, housing its prisoners instead in Lubbock County jail. The Border Patrol was accordingly allowed to expand its use to all cells of the city facility. Although the city no longer housed its prisoners there, it continued to assume the responsibility of feeding the detainees. Border Patrol agents, meanwhile, actually booked detainees into the facility. Between 1977 and December 1981, the Border Patrol detained over 7,000 illegal aliens in the city jail.

The police of Muleshoe, Texas arrested both named appellants—Nabor Ortega in September 1981 and Amelio Gonzalez in December 1981—on suspicion of being illegal aliens. Transferred into the custody of the Border Patrol, both spent between one and three days in the city jail. They later testified that the jail was squalid; trash filled the cells and showers because of infrequent cleanings. Lacking mattresses and blankets, they were forced to sleep on cardboard boxes or sheet metal bunks. The absence of towels and soap, moreover, precluded bathing. Neither protested about these conditions; uninformed of the problems, federal agents and local officials failed to improve conditions except when an agent, noticing Gonzalez's plight, provided him with a mattress and blanket. With the testimony of others corroborating these remembrances, it became clear that the city jail's conditions were unpleasant in those days.

Ortega and Gonzalez—in an action perhaps unusual for illegal aliens—therefore brought this action based on their rights under the Constitution and laws of the United States against Border Patrol agents William Rowe and Hugh Rushton, the Im-

migration and Naturalization Service, the City of Lubbock, and the United States of America. Rowe was the agent in charge of the Lubbock Station[1] of the Border Patrol from July 1977 to August 1984, and Rushton has been Chief Patrol Agent of the Marfa Sector, the administrative area that includes the Lubbock Station, since 1980. Appellants based their suit against federal appellees on the claim that the conditions described violated their due process rights under the fifth amendment. The federal appellees also allegedly violated 8 U.S.C. § 1252 and 18 U.S.C. §§ 4002 and 4042. Appellants alleged that the city conspired with federal authorities in violation of the fourteenth amendment's due process clause. Ortega and Gonzalez sought damages for past wrongs inflicted; they coupled these individual claims to a class action[2] against appellees, seeking injunctive relief against the allegedly unconstitutional conditions. At first, only the city jail was the target of this suit, but appellants amended their complaint to seek injunctive relief against the other jails of the Lubbock Station that the Border Patrol used. Consequently, they were allowed to introduce evidence of other jails' conditions.

The district court entered judgment in appellees' favor. It first concluded that, contrary to appellants' assertion, 18 U.S.C. § 4002 does not require a written agreement between federal and local officials regarding the use of local jails to house illegal aliens. Having found the other statutory bases for appellants' complaint unavailing, the court then ruled that no due process violations occurred. Noting the short stay of most detainees in these jails (usually two or three days before they are deported), it concluded that conditions were not serious enough to be constitutional violations.

On appeal, Ortega and Gonzalez continue to insist that 18 U.S.C. § 4002 requires the

---

1. The Lubbock station covers a 28-county area around Lubbock, Texas.

2. Ortega and Gonzalez were the representatives of a certified class of all people "who are or will

be incarcerated in city and county jails by agents of the Lubbock Station of the United States Border Patrol within its 28-county jurisdiction."

INS to execute written agreements with local officials for use of local jails.[3] To understand this argument, it is first necessary to recognize their perception of this case. To appellants, all the problems discussed result from insufficient delegation of responsibility. Federal agents believed that Lubbock officials were responsible for maintaining the jails, while local officials believed that operations were within the province of the Border Patrol. Resulting from informal, oral agreements, this confusion has in turn caused the problems about which the class complains. By bringing this action, appellants hope that the federal courts will force appellees to cease assuming away their responsibilities; one way to do this is to interpret § 4002 as requiring written agreements, agreements that presumably would detail the duties of both federal and local officials.

■ We cannot interpret § 4002 in such a manner; rather, we conclude that appellants may not use this statute as the basis for a cause of action. Other courts have held that § 4002 provides no implicit private cause of action. *See Owens v. Haas*, 601 F.2d 1242, 1247–48 (2nd Cir.1979) *cert. denied* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979); *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 (3rd Cir.1976); *Williams v. United States*, 405 F.2d 951, 954 (9th Cir.1969). The reasoning of *Owens* is particularly persuasive: of central importance is the absence of any indication in the language or legislative history of § 4002 that Congress intended to provide a private cause of action for prisoners or detainees. 601 F.2d at 1247–48. No indication exists, moreover, that Congress enacted the statute for the benefit of prisoners. *Id.* at 1247. These reasons require us to reject § 4002 as a vehicle for detainees such as Ortega and Gonzalez to compel the federal government's compliance. *See Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975). We also con-

clude that 8 U.S.C. § 1252 and 18 U.S.C. § 4042 are equally unavailing to appellants, for the reasons stated by the district court.

■ We turn now to appellants' constitutional claims. In its memorandum opinion, the district court regarded *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), as the starting point of its constitutional analysis. *Bell* first directs us to the due process clause rather than the eighth amendment in considering the claims of pretrial detainees. 441 U.S. at 535 & n. 16, 99 S.Ct. at 1871 & n. 16. The parties also regard this as a due process case; Ortega and Gonzalez, for example, seek relief against the federal appellees directly under the fifth amendment's due process clause, while bringing the city in on a 42 U.S.C. § 1983 claim of conspiracy to violate detainees' due process rights as guaranteed by the fourteenth amendment. We agree with this assessment. Because the detainees' imprisonment did not result from their conviction for any crimes, the eighth amendment's prohibition of cruel and unusual punishment is inapplicable. *See id.* at 535 n. 16, 99 S.Ct. at 1872 n. 16, *quoting Ingraham v. Wright*, 430 U.S. 651, 671–72 n. 40, 97 S.Ct. 1401, 1412–13 n. 40, 51 L.Ed.2d 711 (1977).

■ At trial and on appeal, the parties have devoted much attention to *Bell*. Recent Supreme Court cases, however, dramatically change the law of due process. In *Daniels v. Williams*, 474 U.S. ——, 106 S.Ct. 662, 663, 88 L.Ed.2d 662, 666 (1986), the court concluded that "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." Although *Daniels* was a procedural due process case, the court's ruling goes further; "(a)s we held in *Daniels*, the protections of the Due Process Clause, whether procedural or substantive, are just not

**3.** This statute provides in part the following: For the purpose of providing suitable quarters for the safekeeping, care, and subsistence of all persons held under authority of any enactment of Congress, the Attorney General may

contract, for a period not exceeding three years, with the proper authorities of any state, territory, or political subdivision thereof, for the imprisonment, subsistence, care, and proper employment of such persons.

triggered by lack of due care by prison officials." *Davidson v. Cannon,* 474 U.S. ——, 106 S.Ct. 668, 671, 88 L.Ed.2d 677, 683 (1986). Had these cases not come down, we would have resolved this case by following *Bell's* dictates, focusing on the purpose of the jails' conditions to decide whether unconstitutional punishment occurred. After *Daniels* and *Davidson,* however, we cannot resolve the case in this way if the conditions resulted from the negligence of the appellees. Indeed, in cases involving only simple negligence of the officials responsible, *Daniels* and *Davidson* render much of *Bell's* language surplusage. Only if the evidence suggests that the appellees knew of the jails' conditions, or intended to force the detainees to endure such conditions, would a *Bell* analysis retain vitality.

The district court found that the individual appellees lacked any intent to punish the detainees. Border Patrol agents, for example, provided blankets and cleaned up the cells. The court concluded that, in general, "those agents and officials corrected shortcomings in jail conditions when they learned of any deficiency." We certainly

cannot question the court's findings because the record shows no evidence of officials' desire to punish the detainees, of their knowledge of their continuing discomfort, or of their reckless disregard of the squalid conditions. The most that can be said is that, objectively speaking, they were unreasonable—in other words, negligent—in failing to inspect the jails regularly.

On appeal, furthermore, the appellants really assert nothing more than negligent supervision. As mentioned before, they view this case as one in which the lack of specific rules under which the INS would use local jails, and the resulting confusion over who was responsible for the jails' upkeep, led to the lamentable conditions that the detainees were forced to endure.[4] By characterizing the problem in this way, appellants can only be saying that the appellees unreasonably neglected to establish clear guidelines. Apparently trying to avoid *Daniels* and *Davidson,* appellants characterize this confusion as "willful indifference." The facts of this case, however, show no more than a sloppy system of cooperation between federal and local authorities.[5] Blindly assuming away one's

---

**4.** The following excerpts from appellants' brief reflect this position:

(I)n virtually all aspects of the jail's operation, the city and INS each thought the other was in charge. As a consequence of this extraordinary confusion, plaintiffs and other detainees were left without supervision, their cells were not cleaned, no bedding was provided, and no one even bothered to turn on the heat in winter.

\*   \*   \*   \*   \*   \*

After the city left the jail, responsibility for cleaning the cells was not clearly assigned to anyone. At the time INS was using the jail, Asst. Chief Bartley did not think the city had any responsibility for sanitation.. Predictably, the cells were not cleaned.

\*   \*   \*   \*   \*   \*

Agent Rowe assumed that the city was responsible for providing mattresses and blankets for INS's detainees, but, as with other matters, he did nothing to confirm that assumption ... For its part, the city left cotton mattresses in the cells when its prisoners were removed in 1978, but assumed that INS took over responsibility for replacing and cleaning the mattresses after that ... Because no one took responsibility for

them, the mattresses left by the city were never cleaned and eventually deteriorated until there were none left, forcing detainees to sleep on the metal bunks or on the concrete floors of the cells.

At oral argument, counsel for appellants maintained this tack: the detainees' injuries resulted from the appellees' failure to divvy up the duties involved in maintaining the jails. This failure, moreover, arose from confusion more than anything else; in its brief, appellants allege that "by failing to clearly delineate responsibility for INS detainees placed in the custody of local facilities, INS procedures invited the kind of confusion which prevailed in Lubbock."

**5.** This is true especially in the light of the rather broad definition of "negligence" the *Davidson* Court makes. Petitioner there informed prison officials that other inmates had threatened him. The officials thus knew of possible dangers, yet did nothing to protect Davidson, whom another inmate eventually wounded seriously. While the officials' conduct could have easily been deemed reckless, the Court agreed with the district court's assessment that they had been only negligent. 106 S.Ct. at 669, 88 L.Ed.2d at 682. If "negligence" describes the conduct there, it must surely do so here.

responsibilities without first discovering others' expectations can be seen as unreasonable—nothing more. This being so, appellees' conduct is not the kind proscribed by the due process clauses of the fifth and fourteenth amendments, as interpreted by *Daniels* and *Davidson*.

Appellants raise other issues; for example, they argue that the district court erred in not allowing the discovery of documents relating to the injury of a detainee. Even here, however, they apparently claim that the appellees were only negligent in incarcerating the detainee. *Daniels* and *Davidson* therefore render consideration of this allegation unnecessary. Similarly, we need not focus on other facts or issues arising from this complex case. The district court's judgment is AFFIRMED.