Errol LYNCH, et al.,
Plaintiffs-Appellees,

v.

Joseph S. CANNATELLA, Jr., et al.,
Defendants-Appellants.

No. 86–3232.

United States Court of Appeals,
Fifth Circuit.

Feb. 27, 1987.

Norman A. Mott, III, Partee, Leefe, Waldrip & Roniger, Emery N. Voorhies, Wm. Guste, Jr., Atty. Gen., Kendall L. Vick, Asst. Atty. Gen., New Orleans, La., for defendants-appellants.

Ellen Sue Shapiro, Office of Immigration Lit., Civ. Div., U.S. Dept. of Justice, Thomas W. Hussey, Washington, D.C., for Lambert.

Nicolas Estiverne, Vernon Thomas, New Orleans, La., for plaintiffs-appellees.

Before GOLDBERG, RUBIN, and POLITZ, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The issue is whether official immunity shields federal and state officials from suit by foreign stowaways who, after being discovered aboard a barge, were detained and allegedly mistreated before being deported. We hold that even excludable aliens are entitled to the protection of the due process clause while they are physically in the United States, but the charges against some of the officials, federal and state, are insufficient to penetrate their official-immunity shield. Because official immunity protects only individuals, not state agencies, we affirm the district court judgment refusing the state-agency defendants such immunity. And, because it is not yet clear whether the wrongs alleged suffice to state a claim for a violation of the stowaways' constitutional rights by a number of individual policemen against whom § 1983 charges are made, we remand for further clarification of the charges.

## I.

The plaintiffs, sixteen Jamaican nationals, allege that in March 1985 they attempted to enter the United States illegally by stowing away aboard a grain barge bound for ports on the Mississippi River. Because the facts have not yet been developed by summary judgment motions, we recite their version of events. Two days before the vessel reached the mouth of the River the captain of the vessel discovered the stowaways and informed the vessel owner by radio of his discovery. The owner of the vessel, without notifying the Immigration and Naturalization Service of the stowaways' presence, approached Edward S. Reed, the Executive Director of the Port of New Orleans, who was employed by the Board of Commissioners of the Port, and asked him if the stowaways could be kept in the custody of the Port of New Orleans Harbor Police while the vessel continued upstream to load additional grain. Reed thereupon ordered the Harbor Police to detain the aliens upon their arrival in New Orleans and to hold them until the barge returned to the Port after its upstream voyage. The stowaways would then be returned to the vessel's owner for passage back to Jamaica.

When the barge arrived at the mouth of the Mississippi, two of the stowaways jumped into the river and tried to swim ashore. The captain of the ship reported the incident to the Coast Guard, which retrieved the pair from the water and placed them in the custody of the INS in New Orleans. The other fourteen remained on the barge until it reached New Orleans where harbor policemen boarded the vessel and took custody of them at gunpoint. The group was then taken to Harbor Police headquarters and locked into short-term detention cells that contained no beds, mattresses, pillows, or heaters. Two days later, INS officials, under the direction of INS District Director David Lambert, placed the two stowaways whom the Coast Guard had removed from the river in the custody of the Harbor Police, where they remained in short-term detention cells with the rest of the original group for eight more days.

The stowaways allege that they were subjected to severe mistreatment during their removal from the barge and while in the custody of the Harbor Police. They contend that it was unnecessary for harbor policemen to board the barge with weapons drawn, to handcuff them, or to chain them together. Such procedures, they complain, terrified and humiliated them. They assert that, while in Harbor Police custody, they were denied such minimal physical comforts as proper bedding, protection from the cold, and adequate access to toilet facilities. They were shackled and forced to perform labor on behalf of the Harbor Police and individual officers under the threat that refusal to work would result in withholding of food. They were required to take showers in unheated water and, when some refused because the cold water was making them ill, were hosed down with a fire hose that slammed them against the iron walls of their cells and left their clothes, blankets, and cell so wet that they could not go to sleep. They also assert that various individual harbor police officers beat them and threatened them. Finally, they contend that, when the Harbor Police were preparing to return them to the barge so that they could be shipped back to Jamaica, the officers drugged their coffee to make them drowsy, locked them in a steel shipping container that the barge owner had ordered to be modified for the return trip, and then sprayed them with "Stun," a deterrent gas.

The defendants contend that, because the barge on which the stowaways had arrived had no facilities for human occupancy or for security, the vessel's owner, in preparation for the return trip to Jamaica, modified a steel container to include toilet facilities and equipped it with life preservers, blankets, water and food. They assert that, to prevent the stowaways from escaping, it was necessary for the container to be locked, and it was lashed to the deck of the barge because there was no other place for it other than the unventilated hold of the barge. The stowaways contend that the

container was in danger of being swept off the barge by heavy surf, and they interpreted remarks by some of the harbor police defendants as threats against their lives. They therefore feared that proper precautions had not been taken to insure their safety and that they would drown—trapped in the container—before reaching Jamaica. Whether their fears were justified was never tested, however, for a few hours after the barge left New Orleans it was intercepted by agents of the Federal Bureau of Investigation, the Coast Guard, and the INS who removed them from the barge. Shortly thereafter, the shipper flew the stowaways home by commercial airline at considerable expense.

Although the sixteen erstwhile stowaways have been unable to gain entrance into the United States since they were returned to their homeland, they have retained counsel who filed a damage action in Louisiana state court in their behalf. The original complaint alleged violations of the stowaways' rights under the United States Constitution, the Louisiana Constitution,[1] and the Louisiana Revised Statutes[2] relating to the rights of individuals arrested for, or convicted of, criminal offenses. It named as defendants the shipper who owned the barge, the tug boat that moved the barge, the unnamed captain of the tug boat, the New Orleans Harbor Police Department, and several named and unnamed Harbor Police officers. After the complaint had been amended to name the captain of the tug boat and to add an allegation that the defendants acted with the intent to cause the plaintiffs' death on the high sea, the case was removed, on defendants' motion, to federal court on the grounds that the parties were of diverse citizenship and the complaint predominantly stated federal claims. Following discovery, the complaint was amended to expand its allegations and to add as defendants David Lambert, Edward Reed, and the Board of Commissioners of the Port of New Orleans (Dock Board).

Lambert, as District Director of the INS, is accused of conspiring with the Harbor Police to violate the civil and constitutional rights of the two persons he allowed to be placed in the custody of the Harbor Police by failing to insure that they were held in a proper facility and treated humanely. He is also accused of conspiring with the shipping company and the Harbor Police to place the stowaways' lives in jeopardy by virtue of his alleged acquiescence in the shipper's plan to modify the barge as a means of transporting the stowaways back to Jamaica.

The Executive Director of the Port of New Orleans, Edward Reed, is said to have conspired with Patrick Bossetta, the President of the shipper, Pike Shipping Company, to incarcerate the fourteen stowaways removed by the Harbor Police from the barge in violation of their civil rights. He is charged with using his influence with the Dock Board to cause the Board to order the Harbor Police to arrest and hold the fourteen stowaways who remained on the barge. The Board is charged with authorizing the Harbor Police to take custody of the stowaways and with responsibility, as the owner of the facilities in which they were detained, for their physical discomfort.

Although the Harbor Police Department is accused in the amended complaint of having violated the stowaways' rights under both the Louisiana and the United States constitutions, the claims against its individual officers are founded upon the sole premise that the police officers' conduct violated the stowaways' civil rights under the United States Constitution. Neither in their amended complaint nor in their other pleadings or papers before this (or any other) court have the stowaways alleged that the acts of individual harbor police officers constitute violations of their rights under the Constitution of Louisiana or state tort law.

In its current form, the amended complaint names only a few police officers who

---

1. La. Const. art. I, §§ 13 & 20.

2. La.Rev.Stat.Ann. § 15:708 (West 1981).

are alleged to be responsible for each alleged wrong. Counsel for the stowaways attributes this shortcoming both to the fact that the Jamaicans have been unable to return to the country to identify which officers were involved and to the unwillingness of the Harbor Police Department to provide photographs of its officers from which such identification might be attempted. After being specifically directed by this court to do so, however, their counsel has specified in some detail which charges apply to each officer. We therefore review the charges as thus amplified.

After the action had been removed to federal court, the stowaways' counsel unsuccessfully petitioned for remand of the case to the Louisiana state courts. Lambert, Reed, the Board, and each individual member policeman named as a defendant in the complaint then filed motions for dismissal or summary judgment on the basis of qualified official immunity. Noting that "good faith" immunity is an affirmative defense and considering that it must therefore be established at trial, the district court denied the motions. Lambert, the Board, Reed, and each of harbor policeman now appeal, contending that they were each entitled to qualified immunity as a matter of law.

## II.

■ To the extent that it turns on an issue of law, the denial of a claim of qualified official immunity is immediately appealable under the "collateral order" doctrine established by *Cohen v. Beneficial Industrial Loan Corporation*.[3] The officials named as defendants in this case contend that, even if the allegations of the complaint are true, their actions have violated no rights of the plaintiffs that can form the basis of civil liability under federal law. If the defendants' assertion is correct, they are entitled to have the damage actions against them dismissed before the

case reaches trial, for the protection afforded by official immunity is not merely immunity from payment of damages for discretionary actions taken in the good faith performance of official duties but also freedom from the burden of standing trial or even unnecessary discovery in cases in which liability is foreclosed as a matter of law.[4] We, therefore, examine the charges made against each government official named as a defendant to determine whether he would be liable if the allegations against him are proved.

### A.

As elaborated in the explanation furnished to this court, the stowaways' charges against the District Director of the INS, David Lambert, are that: (1) he conspired with the Harbor Police to harm the two persons placed in Harbor Police custody because he did not insure that the detention facility utilized was properly maintained and that the stowaways would be well-treated by police personnel; and (2) by sanctioning the shipping company's plan to modify the barge so that it could be used to return the stowaways to their homeland, he conspired with that company and the Harbor Police to jeopardize their lives.

Although the parties apparently dispute the degree of personal authority exercised by Lambert with regard to the stowaways, plaintiffs' counsel has conceded below and again before this court that Lambert had no personal knowledge of the conditions at the Harbor Police detention facility or of the treatment that the Harbor Police allegedly accorded them during their detention. Similarly, the complaint alleges neither that Lambert inspected or approved the accommodations provided on the barge before the stowaways were returned to the vessel nor any facts from which a conspiracy to harm them might be inferred.

■ Plaintiffs who assert conspiracy claims under civil rights statutes must

---

3. 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *See also Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985); *Helton v. Clements,* 787 F.2d 1016 (5th Cir.1986).

4. *Harlow v. Fitzgerald,* 457 U.S. 800, 817–18, 102 S.Ct. 2727, 2737–38, 73 L.Ed.2d 396 (1982).

plead the operative facts upon which their claim is based. Bald allegations that a conspiracy existed are insufficient.[5] In the absence of factual allegations from which a conspiracy to violate the stowaways' rights can reasonably be inferred, the charges against Lambert amount to no more than an assertion that he was negligent in supervising the conditions under which the stowaways were detained. Such negligence cannot amount to a violation of whatever due process rights these stowaways possessed,[6] for, as the Supreme Court observed in *Daniels v. Williams*, "the Due Process clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property."[7] Lambert, therefore, is immune to the claims for damages asserted against him.

### B.

Edward S. Reed, the Executive Director of the Port of New Orleans, allegedly conspired with the shipping company and the Dock Board to place the persons removed from the barge in the custody of the Harbor Police in violation of their due process rights.

■ Aliens who seek initial admission to the United States may be deported if, at an exclusion hearing not subject to appeal,[8] it is determined that they belong to one of the groups classified as excludable aliens by 8 U.S.C. § 1182. Stowaways are included among the groups of excludable aliens.[9] Because they have failed to successfully disembark from the vessel or aircraft that carried them into the United States and to integrate into the general population unimpeded by government officials, stowaways are legally considered detained at the border for purposes of immigrant status and deportation even if they are physically present in the United States,[10] and they do not possess a due process right to remain free of incarceration pending their deportation.[11]

The essence of the stowaways' retort is that they can not be considered to have been stowaways as a matter of law at the time they were detained because they had not been inspected by the INS on the vessel, declared to be stowaways, and entrusted to the custody of the Harbor Police before being removed from the barge.

A federal statute, 8 U.S.C. § 1223(a), the text of which is set forth in the footnote,[12] provides that aliens temporarily removed

---

**5.** *Yglesias v. Gulf Stream Park Racing Ass'n*, 201 F.2d 817, 818 (5th Cir.), *cert. denied*, 345 U.S. 993, 73 S.Ct. 1132, 97 L.Ed. 1400 (1953); *Powell v. Workmen's Compensation Bd. of State of New York*, 327 F.2d 131, 137 (2d Cir.1964); *Hoffman v. Halden*, 268 F.2d 280, 295–96 (9th Cir.1959).

**6.** *Ortega v. Rowe*, 796 F.2d 765, 768–69 (5th Cir.1986).

**7.** 474 U.S. 327, ——, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986).

**8.** 8 U.S.C. § 1226(a). *See also Landon v. Plasencia*, 459 U.S. 21, 27–28, 103 S.Ct. 321, 326–27, 74 L.Ed.2d 21 (1982).

**9.** 8 U.S.C. § 1182(a)(18).

**10.** *See Garcia-Mir v. Smith*, 766 F.2d 1478, 1484 (11th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986).

**11.** *Wong Wing v. United States*, 163 U.S. 228, 235, 16 S.Ct. 977, 980, 41 L.Ed. 140 (1896); *Carlson v. Landon*, 342 U.S. 524, 538, 72 S.Ct. 525, 533, 96 L.Ed. 547 (1952).

**12.** 8 U.S.C. § 1223(a) (1970) provides in pertinent part:

> Upon the arrival at a port of the United States of any vessel ... bringing aliens ... the immigration officers may order a temporary removal of such aliens for examination and inspection ... but such temporary removal shall not be considered a landing, nor shall it relieve vessels ... from any obligations which, in case such aliens remain on board, would, under the provisions of this chapter bind such vessels.... A temporary removal of aliens from such vessels ... ordered pursuant to this subsection shall be made by an immigration officer at the expense of the vessel ... and such vessel ... shall, so long as such removal lasts, be relieved of responsibility for the safekeeping of such aliens: *Provided*, that such vessels ... may with the approval of the Attorney General assume responsibility for the safekeeping of such aliens during their removal ... for examination and inspection, in which event, such removal need not be made by an immigration officer.

from a vessel for examination and inspection are not considered to have landed in the United States and their removal does not relieve the vessel owner from its obligations under federal law. Although the process utilized by Reed, the Harbor Board, and the Harbor Police for detaining the stowaways is not expressly authorized by this or any other federal statute,[13] neither is it prohibited. The temporary-removal provisions of § 1223(a) do not purport to define the rights of aliens. They merely (1) define the responsibilities of the carriers and their agents with regard to aliens that vessels have brought into U.S. ports and (2) outline the duties of INS officials with regard to those aliens and the consequences of official decisions to remove aliens from these vessels. No statute precludes other federal, state, or local law enforcement agencies from taking other action to enforce this nation's immigration laws.

■ Neither the shipper's failure to seek approval of the Attorney General before making arrangements with the Harbor Police nor the fact that the Harbor Police took custody of the aliens and, without INS approval, temporarily removed them from the barge changes the stowaways' status or bestows upon them due process rights they otherwise would not have enjoyed. Reed's involvement in the so-called conspiracy to place the aliens in Harbor Police custody, therefore, cannot—in and of itself—constitute a violation of their civil and constitutional rights. Moreover, because it has not been alleged that Reed condoned, or was even aware of, the conditions and treatment the stowaways endured, his culpability for any abuses he could have prevented is limited to negligence, an unintentional act from whose consequences his immunity would shield him.[14]

■ The complaint also alleges that Reed conspired with the shipping company and other parties to modify the steel container in which the stowaways were to travel back to Jamaica. Like the other conspiracy charges leveled against Reed and Lambert, this is a bald assertion unsupported by any specific factual allegation. It therefore affords no inference of culpable conduct for which liability might be imposed. Although in other circumstances we might remand the case to give the plaintiffs a chance to amend their complaint,[15] in § 1983 cases involving claims of official immunity this court is less tolerant of slip-shod pleading.[16] The plaintiffs have already amended their complaint several times and have had opportunity before this court to amplify their averments against Reed. We are unable to find in any of this the slightest factual basis for imposing liability on Reed. Justice would not, therefore, be served by allowing the plaintiffs to continue improvising allegations until they can articulate a plausible basis to hold Reed in the suit. Like Lambert, he is entitled to enjoy the full benefit of official immunity.

### C.

■ The Board of Commissioners of the Port of New Orleans, as a governmental body, also asserts its immunity, as apparently does the defendant identified only as "the New Orleans Harbor Police Department." Only the Board as a legal entity, not its individual members, is a party to these proceedings. Qualified official immunity protects "individuals acting within the bounds of their official duties, not the governing bodies on which they serve." [17]

13. See 8 U.S.C. §§ 1221–1230 (1970 & 1985 Supp.).

14. *Ortega*, 796 F.2d at 768–69.

15. *See, e.g., Hepperle v. Johnston*, 544 F.2d 201, 202 (5th Cir.1977) (citing *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

16. *See Elliott v. Perez*, 751 F.2d 1472, 1479–82 (5th Cir.1985).

17. *Minton v. St. Bernard Parish School Board*, 803 F.2d 129, 133 (5th Cir.1986) (citing *Owen v. City of Independence, Missouri*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Kingsville Independent School District v. Cooper*, 611 F.2d 1109 (5th Cir.1980)).

The portion of the district court order denying the Board and the Police Department dismissal on the basis of official immunity must therefore be affirmed. Similarly, the claims made against the "Harbor Police Department" solely as a government entity cannot be dismissed on the basis of qualified official immunity. Because our determination that the Board and the Harbor Police Department are not entitled to plead a qualified immunity defense removes consideration of their entitlement to summary judgment from the "collateral order" exception to the final judgment rule, we do not have jurisdiction to decide whether the complaint otherwise states a sufficient claim. For the same reason, and also because the issue is not raised, we express no opinion concerning whether the Harbor Police Department is a legal entity against which a suit might be filed.

### III.

Each of the individual harbor police also asserts immunity from charges made by the stowaways that various individual officers subjected them to physical abuse. Although it has been determined that excludable aliens enjoy even fewer rights than deportable aliens who have succeeded legally or illegally in "landing" in the United States,[18] their right to be free from purposeful physical abuse pending their return to their countries has never been explicitly examined by the courts.

Public officers "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[19] Officials sued for violation of constitutional rights "do not forfeit their immunity by violating some *other* statute or regulation."[20] They are liable for damages only if they violate the federal constitutional or statutory rights that give rise to a § 1983 cause of action for damages. The thesis that official immunity abides unless "clearly established" constitutional rights are violated was first asserted[21] and still remains as a litmus to shield officials who act in a situation in which the bounds of law are not clearly delineated.[22] The harbor police defendants contend, therefore, that, because the courts have not yet had occasion to state the precise constitutional rights afforded excludable aliens, they cannot be held liable for § 1983 damages even if the district court should decide that the injuries allegedly inflicted upon the stowaways did violate their constitutional rights.

### A.

In support of the proposition that excludable aliens possess no constitutional rights, the harbor police defendants rely on dicta contained in the Eleventh Circuit's opinion in *Garcia-Mir v. Meese*[23] in which that court wrote that excludable aliens "have virtually no constitutional rights."[24] Reliance on this partial sentence overstates the scope of the opinion from which it is taken and—even if construed literally—does not mean that such aliens have no constitutional protection whatever.

The fourteenth amendment due process clause protects all "persons" not merely those who are citizens or legal resi-

---

18. *Garcia-Mir v. Smith,* 766 F.2d at 1484 (citing *Landon v. Plasencia,* 459 U.S. 21, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982)).

19. *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738 (citing *Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978); *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975)).

20. *Davis v. Scherer,* 468 U.S. 183, 194 n. 12, 104 S.Ct. 3012, 3020 n. 12, 82 L.Ed.2d 139 (1984).

21. *Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738.

22. *See, e.g., Kaplan v. Clear Lake City Water Authority,* 794 F.2d 1059, 1066 (5th Cir.1986); *Creamer v. Porter,* 754 F.2d 1311, 1317–18 (5th Cir.1985); *Affiliated Capital Corp. v. City of Houston,* 735 F.2d 1555, 1568–70 (5th Cir.1984), *cert. denied,* — U.S. —, 106 S.Ct. 788, 88 L.Ed.2d 766 (1986).

23. 788 F.2d 1446 (11th Cir.1986).

24. *Id.,* 788 F.2d at 1449.

dents. Long ago, in *Yick Wo v. Hopkins*,[25] the Supreme Court noted that its protections apply universally to "all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality."[26] In *Wong Wing v. United States*,[27] the Court held that the due process clause affords illegal aliens present in the United States protection from federal legislation declaring "unlawful residence within the country to be an infamous crime, punishable by deprivation of liberty and property."[28] Applying the reasoning of *Yick Wo*, the Court held that all persons within the territory of the United States are entitled to the protection guaranteed by the fifth and sixth amendments. The fourteenth amendment makes this shield equally strong against state action.[29] In *Plyler v. Doe*, the Court affirmed that illegal aliens are persons within the meaning of the equal protection clause of the fourteenth amendment.[30] And those who are "persons" entitled to equal protection are also entitled to due process.

■ To be sure, the Constitution does not forbid all differences in governmental treatment between citizens and aliens, or between aliens who have been legally admitted to the United States and those who are present illegally. The due process clause does not guarantee aliens, whether present legally or illegally, the same rights as citizens. Excludable aliens, in turn, are situated differently even from illegal aliens who have landed in this country and integrated to some degree into the population. The government may therefore make classifications based on alienage, and these are, depending on their nature, subject either to "close judicial scrutiny"[31] or to rational-basis analysis. In the absence of legitimate, countervailing state concerns, whose relative weight we need not now assess, even illegal aliens, however, are entitled to the guarantees of the fifth and fourteenth amendments.[32] The "entry fiction" that excludable aliens are to be treated as if detained at the border despite their physical presence in the United States[33] determines the aliens' rights with regard to immigration and deportation proceedings. It does not limit the right of excludable aliens detained within United States territory to humane treatment.

■ The basis for limiting the constitutional protection afforded excludable aliens has been the overriding concern that the United States, as a sovereign, maintain its right to self-determination. "As the history of its immigration policy makes clear, this nation has long maintained as a fundamental aspect of its right to self-determination the prerogative to determine whether, and in what numbers, outsiders without any cognizable connection to this society shall be permitted to join it."[34] Courts ordinarily should abstain from placing limits on government discretion in these circumstances because the sovereign interest in self-determination weighs so much more heavily in this scheme than does the alien's interest in entering the country.[35] That

**25.** 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

**26.** *Id.,* 118 U.S. at 369, 6 S.Ct. at 1070.

**27.** 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896).

**28.** *Id.,* 163 U.S. at 237, 16 S.Ct. at 981.

**29.** *See* R. Rotunda, J. Nowak, and J. Young, Treatise on Constitutional Law: Substance and Procedure (1986), § 18.11, p. 472.

**30.** *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).

**31.** *Graham v. Richardson,* 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971). Compare *Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976).

**32.** *See Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *Shaughnessy v. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *Wong Wing v. United States,* 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896).

**33.** *See Garcia-Mir v. Smith,* 766 F.2d at 1484; *Jean v. Nelson,* 727 F.2d 957, 969 (11th Cir.1984) (en banc), *aff'd,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985).

**34.** *Garcia-Mir v. Smith,* 766 F.2d at 1484.

**35.** *Id.*

interest, however, plays virtually no role in determining whether the Constitution affords any protection to excludable aliens while they are being detained by state officials and awaiting deportation. Counsel has not suggested and we cannot conceive of any national interests that would justify the malicious infliction of cruel treatment on a person in United States territory simply because that person is an excludable alien. We therefore hold that, whatever due process rights excludable aliens may be denied by virtue of their status, they are entitled under the due process clauses of the fifth and fourteenth amendments to be free of gross physical abuse at the hands of state or federal officials.

### B.

Citing *Harlow v. Fitzgerald* [36] and *Davis v. Scherer*,[37] the harbor police defendants argue in the alternative that, even if the stowaways have a constitutional right not to be subjected to the treatment they allegedly endured, § 1983 liability cannot be imposed because that right was not clearly established at the time the events occurred.

In *Harlow*, the Supreme Court introduced a purely objective test of good faith into qualified immunity analysis because, under the former test set forth in *Wood v. Strickland*,[38] an official's right not to stand trial on insubstantial claims might too easily be defeated by an artful pleading asserting that the accused official took action with the malicious intention of depriving the plaintiff of his constitutional or statutory rights.[39] Thus, as the Court later stated in *Davis*,[40] "[w]hether an official may prevail in his qualified immunity defense depends upon the 'objective reasonableness of [his] conduct as measured by reference to clearly established law.'" The stated purpose underlying adoption of an objective test was to "permit the resolution of many insubstantial claims on summary judgment" and to avoid "subject[ing] government officials either to the costs of trial or to the burdens of broad-reaching discovery" in cases in which the legal norms the officials are alleged to have violated were not clearly established at the time the events occurred.[41] The conception behind the *Harlow* doctrine is that "where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.'"[42]

The purpose of the immunity doctrine, therefore, is not to indulge the wrongful acts of public officials[43] but to insure that those officials do not hesitate to take actions reasonably calculated to advance the public good. The harbor police defendants contend that they should be immune from defending themselves against the stowaways' charges not because they possessed any reasonable basis to believe that the actions they took were proper and advanced any public good but simply because dicta in cases like *Garcia-Mir v. Meese* arguably raised doubt whether excludable aliens enjoy constitutional protection of even the most fundamental nature. We see no sound reason to apply *Harlow* so mechanically.

While the extent of protection the fourteenth amendment affords to various

**36.** 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

**37.** 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

**38.** 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975).

**39.** *Harlow*, 457 U.S. at 815–16, 102 S.Ct. at 2737.

**40.** 468 U.S. at 191, 104 S.Ct. at 3018 (quoting *Harlow v. Fitzgerald*, 457 U.S. at 818, 102 S.Ct. at 2739).

**41.** *Harlow*, 457 U.S. at 817–18, 102 S.Ct. at 2737–38. *See also Mitchell v. Forsyth*, 472 U.S. at 524–28, 105 S.Ct. at 2815–16.

**42.** *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2738 (quoting *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967)). *See also Mitchell v. Forsyth*, 472 U.S. at 525, 105 S.Ct. at 2815.

**43.** *See Tenney v. Brandhove*, 341 U.S. 367, 377, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951).

groups of persons may turn on their status, that amendment applies by its express terms to "any person." Excludable aliens are not non-persons. It does not require a court ruling for a state official to know that even an excludable alien may not be denied the fundamental liberty interest to be free of gross physical abuse in the absence of some articulable, rational public interest that may be advanced by such conduct. If the argument advanced by the harbor police defendants were sound, the Constitution would not have protected the stowaways from torture or summary execution. To state the proposition is to assure its rejection. The transgressions the various members of the Harbor Police are accused of committing were, therefore, not objectively reasonable by reference to clearly established law within the meaning of *Harlow* and *Davis*.[44]

### IV.

"Section 1983 imposes liability for violations of rights protected by the Constitution, not violations of duties of care arising out of tort law."[45] In order to assure the defendant public officials the full benefit of their qualified immunity doctrine, it is necessary to determine which of the harms the plaintiffs contend they have suffered are serious enough to constitute a deprivation of a constitutional right. To the extent that the complaint, even as expanded by factual allegations on appeal, fails as a matter of law to state a claim against a particular official for which he may be liable, that official's claim of right not to stand trial renders the failure of the district court to grant summary judgment or dismissal immediately appealable.[46] Whether particular police conduct amounts to a constitutional deprivation must, of course, be determined on a case-by-case basis.

The harbor police defendants correctly note that the eighth amendment prohibition against cruel or unusual punishment is not applicable to cases in which the plaintiffs were not in custody as a result of having been convicted of a crime.[47] However, "[a] law enforcement officer's infliction of personal injury on a person by application of undue force may deprive the victim of liberty without due process of law."[48] In a case such as this, in which the conduct attributed to police officers is intentional rather than merely negligent,[49] "deprivation" has been alleged, and the focus of inquiry becomes whether the injury alleged is "so minor as to occasion only a tort claim, not a constitutional invasion."[50]

This court looks at three factors to determine whether injuries inflicted by state officials are so egregious as to constitute a constitutional tort actionable under § 1983: the severity of the injury, whether the state officer's action was grossly disproportionate to the need for action under the circumstances, and whether the action was inspired by malice or was simply the result of carelessness or overzealousness.[51] The complaint alleges that members of the Harbor Police maliciously subjected the

---

**44.** *See Davis v. Scherer,* 468 U.S. at 190, 104 S.Ct. at 3018; *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2739.

**45.** *Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979).

**46.** *Mitchell v. Forsyth,* 472 U.S. at 526, 105 S.Ct. at 2816.

**47.** *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 1408, 51 L.Ed.2d 711 (1977); *Thibodeaux v. Bordelon,* 740 F.2d 329, 333–34 (5th Cir.1984).

**48.** *Shillingford v. Holmes,* 634 F.2d 263, 265 (5th Cir. Unit A 1981).

**49.** *See Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 666, 88 L.Ed.2d 662 (1986); *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986).

**50.** *Shillingford,* 634 F.2d at 265 (citing *Baker v. McCollan,* 443 U.S. at 146, 99 S.Ct. at 2695).

**51.** *Shillingford,* 634 F.2d at 265; *Helton v. Clements,* 787 F.2d 1016 (5th Cir.1986); *Johnston v. Lucas,* 786 F.2d 1254, 1257 (5th Cir.1986); *Hendrix v. Matlock,* 782 F.2d 1273, 1274 (5th Cir. 1986); *Coon v. Ledbetter,* 780 F.2d 1158, 1163 (5th Cir.1986); *Mark v. Caldwell,* 754 F.2d 1260, 1261 (5th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 310, 88 L.Ed.2d 287 (1985).

stowaways to a wide range of abuses and humiliations disproportionate to any legitimate need for action. Thus, the complaint sufficiently alleges facts fulfilling two of the three factors necessary to state a claim surviving an immunity defense. The key inquiry at this stage of the proceedings, therefore, is whether the injuries alleged are serious enough to constitute deprivation of constitutionally protected liberty interests.

With regard to some incidents, the complaint, as amplified and clarified by supplemental briefing ordered by this court, alleges injuries of constitutional magnitude. It is contended, for example, that Joseph S. Cannatella, Jr. ordered Sue Miller to use a high-pressure fire hose to spray stowaways who refused to shower voluntarily because the water was unheated. It is asserted that, when she did so with the aid of Marcus McKinney, the water pressure slammed the stowaways against the bars of their cells. Most of the stowaways who were sprayed allege no serious injuries as a result of the incident, but one stowaway, Barrington Williams, is alleged to have sustained injuries severe enough to require his hospitalization. Williams' claim, therefore, amounts to an allegation that he was deprived of a constitutionally protected liberty interest. Similarly, another stowaway, Wesley Griffiths, alleges that he was beaten and drugged by the harbor police officers and that this has produced in him "a change in personality ... as if he is becoming crazy." We, of course, offer no opinion about the likely merits of these claims. For present purposes, it is sufficient to note that, the allegations of these two stowaways, if proved, may form a sufficient basis for recovery under § 1983.

Many of the other allegations made by the stowaways are patently inadequate to state a claim of constitutional dimension. Among these are allegations regarding verbal threats and the insistence of some officers that stowaways wash official and personal cars to earn their food. " '[M]ere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations.' " [52] Nor does forcing detainees to wash cars give rise to an injury of constitutional magnitude, although it may constitute a tort for which state remedies are available.

The stowaways also seek to impose liability on various members of the Harbor Police for participating in a conspiracy to lock them inside the steel container that the shipper intended to use to return them to Jamaica. The federal statute requires the stowaways to be returned aboard the vessel on which they arrived. Even the steel container provided much more humane accommodations than the bare steel barges on which they originally hid, without sanitary facilities or ventilation. In any event, however, the stowaways possessed no due process right to remain free of incarceration pending their deportation, and the danger they allegedly feared never materialized. The only harm they suffered, therefore, was a few hours of apprehension. Such apprehension cannot, in and of itself, constitute an unconstitutional deprivation of liberty.

The severity of the injuries various stowaways allege they have sustained as a result of being "drugged," "punched," "beaten," and "maced" by officers is difficult to discern even at this late date. The harbor police defendants correctly note that plaintiffs in a § 1983 suit must shoulder the burden of pleading a prima facie case, including the obligation of alleging "detailed facts supporting the contention that the plea of immunity cannot be sustained." [53] That burden is not fulfilled by summarily alleging that the plaintiffs have

---

**52.** *McFadden v. Lucas,* 713 F.2d 143, 146 (5th Cir.), *cert. denied,* 464 U.S. 998, 104 S.Ct. 499, 78 L.Ed.2d 691 (1983) (quoting *Coyle v. Hughs,* 436 F.Supp. 591, 593 (W.D.Ok.1977)). *See also Johnson v. Glick,* 481 F.2d 1028, 1033 n. 7 (2d Cir.1973).

**53.** *Morrison v. City of Baton Rouge,* 761 F.2d 242, 245 (5th Cir.1985) (quoting, *Elliott v. Perez,* 751 F.2d at 1482).

"suffered severe physical pains and extensive mental distress" or that they continue to suffer "severe nightmares and hallucinations" as a result of the treatment they endured.

The individual officers charged in this suit are entitled to specific recitals of the wrong each is alleged to have perpetrated on each plaintiff. Moreover, because they have asserted an immunity defense to the § 1983 action against them, they are entitled to know the nature and degree of injury each plaintiff allegedly suffered as a result of that officer's actions. Only in that way can those officials be protected effectively from being required to bear the expense of litigating a suit grounded upon factual allegations that are insufficient, as a matter of law, to give rise to damages.

Although the deficiencies in the pleadings are due largely to the fault of counsel for the stowaways, the blame may not rest exclusively there. It appears, for example, that the Harbor Police have not cooperated fully with discovery efforts to ascertain the identities of officers actually involved in the incidents alleged. We therefore remand these proceedings to the district court with instructions to allow the plaintiffs one final opportunity to conduct any discovery that may be appropriate for the sole purpose of identifying specific defendants and then to amend their remaining claims against each of the individual harbor police defendants to include the requisite detail outlined above and to dismiss from the suit any individual harbor policeman against whom a sufficient claim cannot be alleged. In doing so, counsel for the plaintiffs must observe the requirements of Fed.R.Civ.P. 11. Those officers who remain named as individual defendants after the final amendment thus allowed are entitled to a determination whether the charges against them, individually, are sufficient to state the basis of a § 1983 suit. If the charges remain insufficient, they will be entitled to dismissal of the federal charges against them with prejudice. Of course, to the extent that the stowaways allege facts that would constitute violations of state law, dismissal of this suit will not prejudice their ability to raise those claims in state court. No such claims, however, have ever been included in this suit, nor should they be permitted to be appended at this late date.

### V.

For these reasons, the order of the district court is REVERSED as to David Lambert and Edward Reed and the suits against them are DISMISSED; as to the Dock Board, the Harbor Police Department, and the individual members of the Harbor Police, the order of the district court is AFFIRMED and the case REMANDED to the district court for further proceedings consistent with this opinion.